Carolyn BRADLEY, et al., Plaintiffs,

v.

Gerald L. BALILES, Governor of the Commonwealth of Virginia, et al., Defendants.

Civ. A. No. 3353–R.

United States District Court,
E.D. Virginia,
Richmond Division.

July 10, 1986.

Jack Greenberg, James M. Nabrit, III, Napoleon B. Williams, Jr., NAACP Legal Defense Fund, Inc., Russell G. Pearce, Linda R. Blumkin, Bonnie Kayatta Steingart, Fried, Frank, Harris, Shriver & Jacobso, New York City, Gladys Bailey Harris, Richmond, Va., for individual plaintiffs.

George B. Little, James K. Cluverius, L.B. Cann, III, Little, Parsley, Cluverius, Richmond, Va., and James E. Sheffield, Timothy M. Kane, David S. Tatel, Allen R. Snyder, Elliot M. Mincberg, Hogan & Hartson, Washington, D.C., and Sue Kaplan, for the School Bd. of the City of Richmond.

William H. Hefty, City Atty., City of Richmond, James Buchanan, Anthony F. Troy, Mays, Valentine, Richmond, Va., for the City of Richmond.

Gerald L. Baliles, Atty. Gen. of Va., William G. Broaddus, Chief Dep. Atty. Gen., Paul J. Forch, James T. Moore, Sr., William Thurston, Phyllis Katz, William J. Bridge, and Gregory F. Lucyk, Asst. Attys. Gen., Richmond, Va., for State Officials (Gov. Robb, Sec. Casteen, Bd. of Educ. and Dr. Davis).

## MEMORANDUM

MERHIGE, District Judge.

The plaintiffs in this matter are the School Board of the City of Richmond and various Richmond Public School District ("RPS") students and parents. Plaintiffs contend that the defendant, the Commonwealth of Virginia ("State"), is constitutionally required to provide additional funding to the Richmond Public School District for compensatory and remedial programs because such programs are necessary to eliminate the vestiges of prior State-mandated segregation. In order to prevail on such a claim, plaintiffs must establish, first, that the State was at least partly responsible for the prior segregation in RPS, second, that some vestiges of this prior State-mandated segregation still remain in RPS and, third, that the remedial and compensatory programs requested are necessary to eliminate such vestiges.

The Court's analysis of plaintiffs' claim is divided into five parts. First, the Court will briefly describe the history of the instant litigation. Next, the Court will discuss the State's role in creating and perpetuating segregated schools in RPS. Third, the Court will explain why plaintiffs have the burden of proving that vestiges of the prior State-mandated discrimination continue to remain in RPS. Fourth, the Court will discuss the reasons behind its conclusion that no vestiges of the prior State-mandated school segregation remain in RPS. Finally, the Court will endeavor to explain why, even if some vestiges of discrimination do remain in RPS, the amount of funding currently provided by the State is sufficient to satisfy its constitutional obligation to eliminate such vestiges.

## I. BACKGROUND

The instant litigation began on September 5, 1961 when the Bradley plaintiffs filed a class action to desegregate the Richmond public school system. The initial product of this litigation was a "freedom of choice" student assignment plan, which was approved by this Court in 1966.

In 1970, plaintiffs filed a motion for additional relief. The Richmond School Board indicated that the freedom of choice plan had not been effective in achieving integration. In April 1971, after considering several proposed desegregation plans, the Court ordered the implementation of a plan designated as "Plan III." *See Bradley v. School Board*, 325 F.Supp. 828 (E.D.Va. 1971). This Plan required extensive busing of students, proximal geographic zoning, pairing, clustering, satellites and racial balance among faculty.

Also, in 1970, plaintiffs joined several additional defendants, including the Virginia State Board of Education as well as Henrico and Chesterfield Counties, both of which adjoin the City of Richmond. In 1972 the Court held that Plan III would not be effective in producing stable desegregation in the Richmond school system. *See Bradley v. School Board*, 338 F.Supp. 67 (E.D.Va.1972). The Court also found that intentional interdistrict constitutional violations had occurred and, accordingly, ordered the consolidation of the Richmond, Henrico County and Chesterfield County public schools. On appeal, the United States Court of Appeals for the Fourth Circuit reversed, holding that an interdistrict remedy was not justified as there was, in its view, insufficient evidence of an interdistrict violation. *See Bradley v. School Board*, 462 F.2d 1058 (4th Cir.1972). The Fourth Circuit's decision was affirmed without opinion by an equally divided United States Supreme Court. *See School Board v. State Board of Education*, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973).

The Richmond public school system has continued to operate under Plan III since the 1971–72 school year. Various modifications to the Plan have been presented to, and approved by, this Court subsequent to 1971.

In March of 1984, RPS filed motions to (1) be realigned as a plaintiff in the instant litigation and (2) rejoin as defendants various State officials with responsibility for the provision and supervision of public education in Virginia. RPS also filed a crossclaim alleging that the named State officials had not fulfilled their constitutional obligation to eradicate the vestiges of segregation in the Richmond Public Schools. Soon thereafter, the individual plaintiffs in this litigation—RPS schoolchildren and their parents—filed an amended complaint alleging claims similar to those asserted by RPS. The Court granted RPS' motion to be realigned as a plaintiff and granted the motions of both RPS and the individual plaintiffs to file their claims against the State.

## II.  BASIS FOR STATE'S LIABILITY

■ The initial issue that must be addressed in determining whether plaintiffs are entitled to the relief requested is whether the State played any role in the creation and/or perpetuation of the segregated school system that existed in Richmond prior to 1972. If the State was not responsible for this prior segregation, then it cannot be liable for any vestiges of such segregation that may remain. If, however, the State was responsible, at least in part, for the prior segregation, then the extent of the State's responsibility must be determined, for the extent of the State's liability is dependent on the extent of its role in creating the condition that is alleged to violate the Constitution.

It is undisputed that, prior to 1972, the State engaged in various activities which contributed to the segregation that existed in RPS. These activities have already been documented in prior opinions issued by this and other courts. *See, e.g., Griffin v. County School Board*, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); *Bradley v. School Board*, 338 F.Supp. 67 (E.D.Va. 1972). Prior to the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), for example, segregated schools were mandated by Virginia's Constitution and statutory laws. Moreover, even after the Supreme Court ruled in *Brown* that segregated schools were unconstitutional, Virginia resisted efforts to desegregate. These ef-

forts were described by the Supreme Court as follows:

> In 1956 Section 141 of the Virginia Constitution was amended to authorize the General Assembly and local governing bodies to appropriate funds to assist students to go to public or to nonsectarian private schools, in addition to those owned by the State or by the locality. The General Assembly met in special session and enacted legislation to close any public schools where white and colored children were enrolled together, to cut off state funds to such schools, to pay tuition grants to children in nonsectarian private schools, and to extend state retirement benefits to teachers in newly created private schools.

*Griffin v. School Board, supra,* 377 U.S. at 221, 84 S.Ct. at 1228.

This Court ruled in an earlier opinion in the instant case that the effect of these and other actions by the State "was to buttress the existing dual system and prevent its dismantling." *Bradley v. School Board,* 338 F.Supp. 67, 96 (1972).

Most, if not all, of the State-imposed impediments to desegregation, however, appear to have been eliminated by 1972. The Virginia Supreme Court of Appeals ruled in 1959 that the legislation closing racially mixed schools and cutting off funds to such schools violated Virginia's Constitution. *See Harrison v. Day,* 200 Va. 439, 106 S.E.2d 636 (1959). The State's Pupil Scholarship Program was terminated in 1970. In 1971, Virginia revised its Constitution to explicitly prohibit governmental discrimination based on race. Article VIII of the Virginia Constitution was revised that same year to require that Virginia's General Assembly "provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth and ... seek to ensure that an educational program

of high quality is established and continually maintained." [1]

The revised version of Article VIII also provided for the establishment of State-wide "standards of quality" for all Virginia school districts. In 1974, the General Assembly promulgated the standards of quality for Virginia's schools. These standards were amended in 1976 to provide that "[r]emedial work shall begin for low-achieving students at all grade levels upon identification of their needs." Va.Code § 22.1–253.1.A. The standards of quality required that "school divisions with twenty-five percent or more of their fourth-grade students who are one or more years below grade level ... assign additional instructional personnel, along with necessary materials, to provide remedial instruction in the primary and intermediate grades." Va. Code § 22.1–253.8.C. The standards also mandated that "school divisions ... assign additional instructional personnel, along with necessary materials, to provide remedial instruction at the secondary level." Va.Code § 22.1–253.8.D. The standards provided for additional State funding for these remedial programs. Although the standards did not explicitly state that they were intended to combat the effects of prior segregation, it is clear that, to the extent that segregation had adversely affected the educational achievement levels of RPS students, the standards would have had such an effect.

Plaintiffs contend, however, that the State has engaged in activities subsequent to 1972 which have impeded the desegregation of Richmond's public schools. Specifically, plaintiffs allege that the State has reinforced and perpetuated segregation in RPS by (1) accrediting private schools without considering whether such schools maintained discriminatory admissions policies or were being used as a haven for those persons seeking to avoid desegregation, (2) permitting private school teachers to par-

---

1. The former provision required only that the General Assembly "establish and maintain an efficient system of public free schools throughout the State." Va. Const. § 129. This provision had been interpreted by Virginia's Supreme Court of Appeals as permitting a district to refuse to provide any public schools at all. *County School Board v. Griffin,* 204 Va. 650, 133 S.E.2d 565 (1963).

ticipate in the State's pension plan, (3) selecting Varina High School—which is located in Henrico County—rather than a city school, as the site for a special Governor's School for Educational Research and Technology, (4) placing limitations on the consolidation of school districts, (5) foreclosing Richmond's ability to annex adjoining county land and (6) diverting federal educational funds that could have been used to combat the vestiges of past segregation. The Court will address each of these contentions seriatim.

It would appear that the existence of private schools in Richmond has had some effect on the racial composition of Richmond's public schools. As of 1980, approximately one-half of all the white households in Richmond sent their children to private schools. Although some black households also sent their children to private schools, the number of such households was less than one percent. In the 1980–81 school year, only 15.6% of Richmond's students were white, while 84.4% were black. Accordingly, the Court concludes that the Richmond private schools, which were predominantly white, have contributed to the predominantly black composition of Richmond's public schools.

The mere existence of State-accredited private schools in Richmond, however—even if such schools did have the effect of furthering to some extent the racial imbalance in the Richmond public schools—is not in itself a sufficient basis for a finding of State liability. Plaintiffs do not contend that private schools should be completely eliminated. Plaintiffs do note, however, that the State accredited private schools without inquiring into whether such schools discriminated on the basis of race. No evidence was introduced at trial, however, that any private school in Richmond either has previously discriminated on the basis of race or presently discriminates on such a basis. Accordingly, the Court cannot find that the State's failure to require a policy of non-discrimination in private schools has impeded desegregation in Richmond's public schools. Moreover, even if the State's accreditation policies did consti-

tute a violation of the State's constitutional obligation to facilitate desegregation, the most appropriate remedy for such a violation would be to require the State to change its accreditation policies, rather than to provide additional funding to RPS.

It does appear, however, that the inclusion of private school teachers in the State's pension plan has had some effect in impeding desegregation in RPS. The Supreme Court, in its description in *Griffin v. County School Board, supra,* of the State's resistance to desegregation, explicitly included the State's extension of retirement benefits to private school teachers as an example of such resistance. *See* 377 U.S. at 221, 84 S.Ct. at 1228. The participation of private school teachers in the State's pension plan was terminated in 1983. This affirmative State aid to private schools may be assumed to have impaired desegregation in RPS to at least some extent. It is unclear, however, just how great an effect the pension plan did have on desegregation efforts.

Plaintiffs' third contention—that the State unjustly discriminated against RPS by selecting Varina High School, rather than a high school in RPS, as the site for a model school—is meritless. Plaintiffs note that the State specifically mentioned the racial composition of Richmond's schools as one of the reasons Richmond was not chosen as the site for the model school. The Court finds, however, that it was entirely appropriate for the State to consider the racial composition of the various school districts in determining where the model school was to be located. The Governor's School for Educational Research and Technology was intended to serve as a model for other Virginia schools. Accordingly, the State wanted to locate the school in an area that would be representative of the State as a whole. The racial composition at Varina was almost exactly the same as that of the State. Moreover, Varina's students come from rural, suburban and urban areas, and also from farms, low-income housing projects and middle class homes. Varina's diversity would therefore seem to

make it an ideal site for a school that was to serve as a model for the entire State. Accordingly, the State's selection of Varina High School as the site for the Governor's School cannot be considered a discriminatory act.

Plaintiffs' fourth contention is that the State has isolated RPS by placing limitations on the consolidation of school divisions. This Court noted in 1972 that, although the State Board of Education had frequently advocated the consolidation of school divisions as a means of maintaining segregated schools, it had not endorsed such consolidation as a means of furthering desegregation. The Court concluded that "[s]uch reticence affirmatively gives rise to an inference of intention ... to preserve such amount of racial segregation as is possible and a rejection of any affirmative obligation to assume the task of desegregation." *Bradley v. School Board,* 338 F.Supp. at 95. Plaintiffs contend that State actions subsequent to 1972 have further limited the use of consolidation as a means of promoting desegregation. Specifically, legislation was enacted in 1978 which provided, first, that school divisions could only be consolidated if each of the local governmental bodies involved consented to such consolidation and, second, that the General Assembly could veto any proposed consolidation. Va.Code § 22.1–25. Plaintiffs have not, however, produced any evidence indicating that this legislation was introduced with a discriminatory purpose. Moreover, there was no evidence that RPS had ever attempted to consolidate with any of the adjoining districts or that such consolidation was even desired. Accordingly, the Court rejects plaintiffs' contention that the State has unconstitutionally impeded desegregation in Richmond by placing limitations on the consolidation of school districts. Moreover, even if plaintiffs were correct in their assertion that § 22.1–25 constitutes a violation of the State's constitutional obligation to take all steps necessary to eliminate the vestiges of prior segregation, the appropriate remedy would seem to be to invalidate the offending portions of that statute rather than to provide more money to RPS.

Plaintiffs' fifth assertion, that the State perpetuated segregation in RPS by foreclosing Richmond's ability to annex adjoining county land, is similarly unpersuasive. Annexation has been a subject of legislation and study in Virginia since at least 1930. *See, e.g.,* Chapter 211, Acts of Assembly of 1930 (prohibiting cities from annexing parts of certain counties); Chapter 22, Acts of Assembly of 1938 (extending coverage of Chapter 211, *supra*); House Document No. 9, 1940 Session (Report of the Virginia Commission on County Government discussing issue of annexation of counties by cities). Plaintiffs note that shortly after this Court joined the State, Henrico County and Chesterfield County as defendants in the instant litigation in December 1970, the Virginia General Assembly enacted legislation which imposed a moratorium on Richmond's ability to annex either Henrico or Chesterfield County. *See* 1971 Va. Acts 234. This moratorium, however, did more than just preclude Richmond from annexing adjoining counties; it also prevented Henrico and Chesterfield Counties from implementing city charters, which would have permanently foreclosed Richmond from annexing any part of either of those governmental divisions and, further, created a Commission to conduct a study of the annexation problem in general. In 1972, Chapter 234 was amended to extend to all cities and counties in Virginia. *See* 1972 Va. Acts 712. In 1979, after a long series of studies on the subject, legislation was enacted which allowed certain heavily populated counties to petition for total immunity from annexation. *See* Va.Code §§ 15.1–977.19:1—15.1–977.24. Although plaintiffs are correct in their assertion that this statute precludes Richmond from annexing any of its adjoining counties, it appears that the statute was enacted for purposes other than to impede desegregation in RPS. Some of the concerns regarding annexation disputes were the increasing costs, both monetary and political, of annexation suits, and the counties' reluctance to relinquish any of their tax base to ad-

joining cities. Accordingly, the State's prohibition of certain types of annexation cannot be considered an attempt to isolate RPS. Moreover, as with the issue of the consolidation of school divisions, even if the prohibition on annexation did constitute a violation of the State's duty to further desegregation in RPS, the appropriate remedy would be to strike the unconstitutional statutory provisions, rather than to require additional State funding to RPS.

Plaintiffs' final example of post–1972 State actions that have allegedly impeded desegregation in the Richmond public schools is the manner in which the State has applied for federal funding. Specifically, plaintiffs note that the State did not include desegregation-related needs in its Chapter II funding formula. Although plaintiffs are correct in their assertion that desegregation-related needs were not explicitly included in the State's Chapter II funding formula, the State did allocate thirty-five percent of its Chapter II funds on the basis of economic deprivation and low student achievement. Pursuant to the State's Chapter II funding formula, RPS received more Chapter II funding than any other school division in Virginia, with the exception of Fairfax and Norfolk, and two to three times more funding under Chapter I and Chapter II than either Chesterfield or Henrico County. The Court therefore concludes that the State's policies regarding federal funding have not unconstitutionally impeded desegregation in RPS.

In sum, then, the Court concludes that the primary State activities which perpetuated and reinforced segregation in RPS occurred prior to 1972. Although the State may have engaged in some activities subsequent to 1972 which impaired to some extent desegregation in RPS, most of these activities were supported by legitimate, nondiscriminatory reasons. The only post–1972 State act that does not appear to have been justified—the State's inclusion of private school teachers in the State's pension plan—would seem to have had a fairly minimal impact on desegregation in RPS.

The instant case may therefore be distinguished from several other cases in which additional funding has been ordered for compensatory and remedial programs, for the length of time that has elapsed since the last state act which significantly impeded desegregation is much longer here than in these other cases. In *Little Rock School District v. Pulaski County Special School District No. 1*, 778 F.2d 404 (8th Cir.1985), which was decided in 1985, the state had approved racially segregative school sitings in violation of district court decrees as recently as 1980. *Id.* at 417. Moreover, even as of the time of the court's decision, the State had "never promulgated any rules or guidelines which would encourage the local school districts to eliminate discrimination in their school systems." *Id.* Similarly, in *Liddell v. State of Missouri*, 731 F.2d 1294 (8th Cir. 1984), a case decided in 1984, the Missouri Constitution mandated segregated schools until 1976; moreover, the St. Louis public schools had remained segregated until 1980. *Id.* at 1305–06. Finally, in *Kelley v. Metropolitan County Board of Education*, 615 F.Supp. 1139 (M.D.Tenn.1985), the Tennessee constitution had mandated segregated schools until 1978 and, even at the time the case was decided, state law authorized the governor to withhold all state funds from local school boards which voluntarily adopted busing plans to achieve desegregation. *Id.* at 1144, 1149.

### III. BURDEN OF PROOF

█ Having concluded that, at least prior to 1972, the State has engaged in actions which had the effect of perpetuating segregation in RPS, the Court must now determine which of the parties has the burden of proof regarding whether any vestiges of the past State-imposed segregation still remain in RPS. The Court concludes that, under any one of four possible theories, the burden of proof lies with the plaintiffs.

The first theory under which the burden of proof may be placed on plaintiffs is based on the Fourth Circuit's decision in *Vaughns v. Board of Education*, 758 F.2d

983 (4th Cir.1985). One of the claims raised by the plaintiffs in *Vaughns* was that the Prince George's County school system discriminated against blacks in regard to enrollment in the County's special education and talented and gifted education programs. The district court, relying on a case decided by the Sixth Circuit—*Oliver v. Kalamazoo Board of Education*, 640 F.2d 782 (6th Cir.1980)—had placed the burden on the plaintiffs to establish that the racial disparities in placement in the abovementioned programs were causally related to prior segregation. The Fourth Circuit, however, ruled that the district court's reliance on *Oliver* was misplaced because the *Oliver* court had placed the burden of proof on the plaintiffs "only because the school system had achieved unitary status *with regard to student assignment.*" 758 F.2d at 991 (emphasis added). The Fourth Circuit therefore appears to have ruled in *Vaughns* that, so long as a school district has achieved unitary status in the area of student assignment, the burden of proving a causal connection between prior segregation and deficiencies that are alleged to currently exist in a school system lies with those who claim that vestiges of the prior discrimination remain in the system.

If the allocation of the burden of proof depends only on whether there is discrimination in student assignments, then it is clear that the burden of proof in the instant case must fall on plaintiffs. The parties have stipulated that, since at least the 1971–72 school year, no person is, or has been, intentionally excluded by the Richmond School Board from any school program or activity offered within the Richmond public school system because of his or her race. RPS has therefore achieved unitary status in regard to student assignment. Accordingly, under the test set forth in *Vaughns*, the burden of proving

that vestiges of prior segregation remain in RPS lies with the plaintiffs.

It might be argued, however, that the burden of proof cannot be placed on the plaintiffs unless RPS has achieved unitary status, not only in regard to student assignment, but in all respects.[2] The Court finds that, even if RPS is required to have attained unitary status in all areas, RPS would meet such a test.[3]

First, it may be reasonably contended that RPS was adjudged to have achieved unitary status in 1972, for the Fourth Circuit appeared to hold in its 1972 decision in *Bradley v. School Board* that RPS was at that time a unitary school system. *See* 462 F.2d at 1061, 1070. The basis for the Fourth Circuit's conclusion is unclear, however, for the Fourth Circuit did not articulate any facts supporting its statements that RPS was unitary. As plaintiffs note, the mere implementation of a desegregation plan does not automatically convert a dual system into a unitary one. *See Riddick v. School Board*, 784 F.2d 521, 533 (4th Cir.1986). As Plan III—the desegregation plan implemented by this Court in 1971—had only been in existence for, at most, one year at the time of the Fourth Circuit's decision, it seems unlikely that RPS could have achieved unitary status at that time.

Even if, as plaintiffs contend, RPS had not attained unitary status in 1972, however, the Court finds that RPS has now achieved such status. The traditional test for determining whether a school district has achieved unitary status is that which was enunciated by the Supreme Court in *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Under the *Green* test, a school district will be deemed unitary when it is devoid of racial discrimination in regard to faculty,

---

**2.** To the extent that the Fourth Circuit's decision in *Vaughns* was based on *Oliver v. Kalamazoo Board of Education*, however, such an argument would appear to lack merit, for the *Oliver* court did not find that the Kalamazoo city schools had achieved unitary status in all respects.

**3.** It cannot be disputed that, in this Circuit at least, once a school district has been found to be unitary in all respects, the burden of proving present discrimination falls on those claiming that such discrimination exists. *See Riddick v. School Board*, 784 F.2d 521, 534, 538 (4th Cir. 1986).

staff, transportation, extracurricular activities, facilities and pupil assignment. 391 U.S. at 435, 88 S.Ct. at 1692. It is clear that, if these factors are the only ones to be considered in determining whether a school division is unitary, RPS must now be found to be a unitary school system. In response to one of defendant's requests for admissions, plaintiffs conceded that there was no intentional discrimination or segregation in RPS in regard to school board appointments, faculty appointments, compensation and assignments, transportation, curriculum, extracurricular activities, physical plant, support facilities and construction and location of schools within the division. This admission is supported by the evidence introduced at trial.

Plaintiffs contend, however, that other factors, such as student achievement levels, should also be considered in determining whether a school system is unitary. Plaintiffs have not cited any cases in which any factors other than those explicitly mentioned in *Green* were considered in determining whether a particular school system had achieved unitary status. Moreover, in *Riddick v. School Board, supra,* the most recent Fourth Circuit case to discuss the standard for making such a determination, the Fourth Circuit considered only those factors cited in *Green* in its affirmance of the district court's finding that the school district was unitary. The *Riddick* court stated as follows:

> Under the mandate of *Brown* "[s]chool boards ... then operating state-compelled dual systems were ... clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated *root and branch.*" ... *All* aspects of public education must be freed from the vestiges of state sanctioned racial segregation before a school system becomes unitary. *Integration must occur in the system's faculty, staff, transportation practices, extracurricular activities, facilities and pupil assignment.*

784 F.2d at 532–33 (emphasis added) (citation omitted).

It therefore appears that discrimination will be deemed to have been eliminated "root and branch" for the purposes of determining whether a school system is unitary if discrimination has been eliminated in the six areas identified in *Green.* Such an approach would seem to be reasonable, for the primary defect in segregated school systems was the separate and inferior treatment of blacks inherent in such systems. This defect *in the system itself* would be remedied by non-discrimination in the areas enumerated in *Green.* That the elimination of discrimination within the system is the primary concern of a desegregation effort is indicated by the very terms "dual" and "unitary." A dual school system is one which actually consists of two separate systems—one for blacks and one for whites. A unitary system is one in which such a dichotomy does not exist. The elimination of the *vestiges* of segregation, in areas such as student achievement, is ancillary to and separate from the primary goal of eliminating the *segregation itself.*

Moreover, if a determination as to a school division's unitary status required an inquiry into factors in addition to those mentioned in *Green,* it would seem that such an inquiry would have been undertaken in *Riddick,* for the Norfolk school system has a poorer record than does RPS in many of the areas which plaintiffs claim the Court should consider in the instant case. Norfolk has a higher dropout rate than does RPS (11.5% to 7.9%), a lower graduation rate (51.0% to 53.5%) and lower scores on the fourth grade SRA achievement tests in both mathematics (46% to 57%) and reading (41% to 52%). Accordingly, the Court concludes that, even if it is necessary for RPS to achieve unitary status in areas in addition to student assignment in order to place the burden of proof on the plaintiffs in the instant matter, RPS has achieved unitary status in all of the areas that must be considered under the applicable legal standard.

The third justification for placing the burden of proof on plaintiffs in the instant

case is based on the length of time that has elapsed since a desegregation plan was implemented in RPS. Under this theory, it is irrelevant whether RPS has attained unitary status. This approach was adopted by the Sixth Circuit in *Oliver v. Kalamazoo Board of Education, supra,* which stated:

> We would agree that, at the inception of a desegregation effort, such as the situation that was presented to the Court in *Milliken II, supra,* the district court could, in ordering ancillary programs, presume that disparity in achievement was related to the segregated schools.... But we believe it is unrealistic to presume that this disparity in achievement is related to school segregation that ended in 1971 and that the district court erred in so presuming.

640 F.2d at 811.[4]

The case for placing the burden of proof on the plaintiffs is even stronger in the instant case than in *Oliver,* for only nine years had elapsed between the implementation of a desegregation plan and the Court's decision in *Oliver,* while fourteen years have passed since the institution of a desegregation plan in the instant case. Moreover, unlike the students in *Oliver,* no student currently attending school in RPS has ever personally been subjected to *de jure* segregation.

It is true that the Fourth Circuit stated in *Vaughns* that the burden of proof had been placed on the plaintiffs in *Oliver* because the court had found that the school district had achieved unitary status in regard to student assignment. *See supra* p. 687. There is some question, however, as to whether *Vaughns* is binding on the Court in the instant case. First, the Court cannot find any indication in *Oliver* that the Sixth Circuit's allocation of the burden of proof was dependent on a finding that the school district had achieved unitary status in regard to student assignment. Second, *Vaughns* is factually distinguishable

from the instant case. The complaint in *Vaughns* was that discrimination remained in the school system itself, namely, in the manner in which students were selected for participation in certain educational programs. The plaintiffs in *Vaughns* contended that the criteria used to select students for these programs were racially biased. In the instant case, however, the claim is not that any discrimination currently exists in the system, but rather only that vestiges of prior discrimination remain in RPS.

Finally, the burden of proof may reasonably be placed on plaintiffs for the simple reason that the Court has never previously determined that vestiges of the prior segregation exist in RPS. The burden is on the defendants to establish that segregation has been eliminated in areas such as student and faculty assignment, for the Court has already ruled that segregation did at one time exist in those areas. Similarly, if the Court had determined in an earlier proceeding that vestiges of the prior segregation remained in RPS in areas such as student achievement, it might be appropriate to place the burden on defendants to establish that such vestiges have now been eliminated. However, since it has never been determined that vestiges of segregation remain in RPS, it is appropriate to place the burden on plaintiffs to prove such a claim in the first instance.

The Court therefore concludes that, for any of the above four reasons, the plaintiffs in the instant case should have the burden of proving that vestiges of prior State-mandated segregation remain in RPS.

## IV. VESTIGES OF PAST STATE–MANDATED SEGREGATION

Plaintiffs contend that vestiges of past State-mandated segregation remain in RPS in the form of racial isolation and educational deprivation. In assessing the va-

---

**4.** The *Oliver* court did go on to state that, "[w]e believe that this is particularly true in light of the fact that, in 1971, only four elementary schools were identifiably black and that no other schools were identifiably black applying the

± 15% standard." 640 F.2d at 811. There is no indication, however, that the allocation of the burden of proof would in fact have changed if the racial composition of the Kalamazoo schools had been different.

lidity of plaintiffs' claim, the Court bears in mind the Second Circuit's admonition that, in desegregation cases involving claims for additional funding, "a court must be alert not to permit a school board to use a court's broad power to remedy constitutional violations as a means of upgrading an educational system in ways only remotely related to desegregation." *Arthur v. Nyquist*, 712 F.2d 809, 813 (2d Cir.1983). Although increased State funding to RPS would be desirable, as such funding would almost certainly have a beneficial effect on the quality of the education offered to RPS students, the Court only has the authority to order such funding if it is necessary to remedy the effects of past State-imposed segregation.

■ As an initial matter, the Court deems it appropriate to express its views as to the limitations on the factors it may consider in determining whether remedial programs may be ordered. Plaintiffs' claim is based on *Milliken v. Bradley (Milliken II)*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), which was the first case in which the Supreme Court proclaimed that compensatory programs could be ordered to remedy the effects of past school segregation. *Milliken II* established a three-part test to determine whether a court can constitutionally order the implementation of particular remedial programs in a school system. This test requires first, that the remedy be tailored to cure the condition that offends the Constitution, second, that the programs be designed to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct and, third, that the programs take into account the interests of state and local authorities in managing their own affairs. *See* 433 U.S. at 280–81, 97 S.Ct. at 2757.

The Court concludes that, in applying the test enunciated in *Milliken II*, the only factors that may be considered in the instant case in determining whether remedial programs may be ordered are those deficiencies which are alleged to exist in the Richmond Public School system itself, and not any indirect effects that the prior school segregation may have had on current RPS students. The condition that offends the Constitution in a school segregation case is the provision of a discriminatory education. The constitutional right to which students are entitled is therefore an education provided in a non-discriminatory manner. In determining whether this right has been or is being denied, the Court must consider whether any discrimination remains in the school system. Examples of such factors would be racial bias in the tests administered by RPS, discrimination in the manner in which students are selected for various educational programs and inadequacy of current RPS teachers due to their attendance in inferior, segregated schools in RPS.

The Court finds, however, that it cannot consider any factors other than those vestiges of the prior segregated system that are alleged to exist in the school system itself. As will be noted below, *see infra* pp. 698–699, the Court believes that one of the primary causes of the previous low achievement levels of RPS students was the high incidence of poverty in the system. Although the Court feels that one of the reasons for the high poverty rate in Richmond is the inferior education that was provided to blacks under the former dual system, it is not within the Court's power to remedy either the poverty itself or the ancillary effects of such poverty. If, for example, the causal relationship between prior school segregation, present low-income status and poor educational performance could support an order requiring the State to provide funding to RPS, there would seem to be no reason why the State could not also be required to provide funding directly to those persons whose low income is attributable to the prior segregation and thereby raise them to the income levels they would have achieved absent the school segregation. Such a result, however, would clearly not be supported by the law.

■ The Court's conclusion as to the limitations on the factors it may consider in

the instant case is supported by the Supreme Court's decision in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The Chief Justice, speaking for a unanimous Court, stated in *Swann* that:

> The target of the cases from *Brown I* to the present was the dual school system. The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage.

402 U.S. at 22, 91 S.Ct. at 1279.

The Constitution does not guarantee those students who have never personally been subjected to *de jure* school segregation the right to be free of all of the effects of prior segregation; rather, it only requires that such students be provided a non-discriminatory education.

█ In view of the aforementioned limitations on the factors that may be considered in the instant case, the Court's analysis of the relevant case law and the facts of this particular case lead it to the conclusion that the prayed for relief must be denied.

### A. Case Law

A review of the cases cited by plaintiffs reveals that all of them are factually distinguishable from the instant case. First, in *Milliken II* itself, the remedial and compensatory programs were included as part of a desegregation decree which implemented student reassignments. Similarly, in eight of the thirteen cases cited by plaintiffs, the remedial and compensatory programs were components of the initial desegregation plans implemented in the districts. In contrast, in the instant case, plaintiffs' request for remedial and compensatory programs

comes after a desegregation plan has been in place in RPS for fourteen years. It is true that there is no indication in the Supreme Court's opinion in *Milliken II* that remedial and compensatory programs may only be ordered at the inception of a desegregation plan.[5] *See Oliver v. Kalamazoo Board of Education,* 640 F.2d 782, 789 (6th Cir.1980). However, the longer the time since a school system has been segregated, the less likely it would be that vestiges of such segregation remain in the system.

Moreover, the instant case is also distinguishable from the five remaining cases cited by plaintiffs in which remedial and compensatory programs were ordered some time after the initial implementation of a desegregation plan. In three of these cases, the states involved had either recently engaged in or were currently engaging in activities having a significant segregative effect. In *Liddell v. State of Missouri,* 731 F.2d 1294 (8th Cir.1984), for example, the Missouri Constitution mandated separate schools for blacks and whites until 1976. In addition, a desegregation plan had not been implemented until 1980— only four years before the court's decision in that case. Moreover, the St. Louis schools were so deficient, they did not meet the standards established by the State of Missouri for Class AAA status, even though seventy-four percent of Missouri's schools had a Class AAA rating. In contrast, it is undisputed that RPS' schools handily meet the standards promulgated by the State of Virginia for public schools.

Similarly, *Little Rock School District v. Pulaski County,* 778 F.2d 404 (8th Cir. 1985), is distinguishable from the instant case in a number of ways. First, the school district involved in that case had never achieved unitary status. *See* 584 F.Supp. 328, 352 (E.D.Ark.1984). Moreover, unlike the State of Virginia in the instant case, Arkansas had engaged in ac-

---

**5.** However, although *Milliken II* does not preclude the implementation of remedial and compensatory programs after a desegregation program has been in operation, the only issue explicitly decided in *Milliken II* itself was whether such programs could be ordered for students

who had themselves been subjected to past *de jure* segregation. *See* 433 U.S. at 269, 97 S.Ct. at 2751. In contrast, the parties in the instant case have stipulated that no student presently attending school in RPS has ever been directly subjected to *de jure* segregation.

tivities, which had either ended only shortly before the case was decided or were currently still in effect at the time of decision, which had a significant effect in perpetuating segregation in the Arkansas schools. First, even at the time of trial, Arkansas took the position that state law did not permit it to assist local school boards in their desegregation efforts. Second, the state had never promulgated any rules or guidelines which would encourage the local school districts to eliminate discrimination in their school systems. Moreover, up until 1983, state law had required separate schools for whites and blacks. Finally, the state had approved racially segregative school sitings in violation of district court decrees as recently as 1980.

*Kelley v. Metropolitan County Board of Education,* 615 F.Supp. 1139 (M.D.Tenn. 1985), is also distinguishable from the instant case by virtue of the segregative actions taken by the state. As noted above, *see supra* p. 686, Tennessee's Constitution mandated separate schools for whites and blacks until 1978. Moreover, state law authorizes the Governor to withhold funds from school districts which use busing for desegregation purposes.

The remaining two cases—*Tasby v. Black Coalition to Maximize Education,* 771 F.2d 849 (5th Cir.1985) and *Jenkins v. State of Missouri,* 639 F.Supp. 19 (W.D.Mo. 1985)—are also distinguishable from the instant case, for the performance levels of the students in the school districts involved were significantly lower than the performance levels of present-day RPS students. In *Tasby,* 59% of the students for which remedial programs had been ordered were reading below the 30th national percentile, while 82% of such students were below the 50th percentile. *See* 771 F.2d at 853. Similarly, in *Jenkins,* forty-one of the fifty elementary schools were performing below national norms in reading and math, and the objective of the programs ordered by the court was to bring elementary reading scores *up to* the national norm within four to five years. *See* at 24–25. In contrast, RPS' elementary students are *already* attaining scores *above* the national norm for, in 1985, the composite score attained by RPS fourth graders on the SRA achievement test ranked them in the 59th percentile nationwide.

In sum, then, each of the other cases in which courts have ordered the implementation of remedial or compensatory programs to remedy the effects of past segregation are factually distinguishable from the instant case. In each case, there was greater support than appears to exist in the instant case for a finding that vestiges of prior state-imposed segregation remained in the particular school system involved, either because (1) the programs were implemented at the inception of a desegregation plan, rather than years after such a plan had been in operation, (2) the state had only recently stopped engaging in, or was still engaging in, activities which had a significant segregative effect or (3) the achievement levels of the students in the school divisions involved were significantly lower than the achievement levels of current RPS students. The Court recognizes that the fact that the instant case is distinguishable from all of the other relevant cases does not necessarily indicate that the remedial and compensatory relief requested by plaintiffs in the instant case is unwarranted; the Court does note, however, that the case for such relief appears to be weaker here than in any of these other cases. With this observation in mind, the Court will attempt to analyze plaintiffs' claim that vestiges of past segregation continue to remain in RPS.

### B.  Racial Isolation

It is undisputed that RPS is currently racially isolated. Approximately eighty-seven percent of RPS' students are black. Of RPS' twenty-nine elementary schools, fourteen are ninety percent or more black. Similarly, four of RPS' eight middle schools are ninety percent or more black, and three

of the six high schools are more than ninety percent black.[6]

The issue to be decided, however, is not merely whether racial isolation currently exists in RPS, but rather whether such isolation is attributable to the prior State-mandated segregation. Defendants note that the Fourth Circuit stated in an earlier opinion in this case that "the root causes of the concentration of blacks in the inner cities of America are simply not known." *Bradley v. School Board,* 462 F.2d 1058, 1059, 1066 (4th Cir.1972). Although the Fourth Circuit's finding does constitute the law of the case and is therefore binding on this Court in the instant proceeding, the Court, nevertheless, concludes that it would be prudent to consider and evaluate the evidence that was presented at trial.

The Court first notes that the increase in the percentage of black students in RPS, and the concomitant decrease in the percentage of white students, began long before desegregation in the public schools was ever ordered or even considered. In every year since 1929, the percentage of white students attending public schools in Richmond has declined, while the percentage of black students has increased. In 1929, seventy percent of RPS' students were white, while thirty percent were black. In 1954, the year in which the Supreme Court ruled that segregated schools were unconstitutional, RPS' student population was 56.5% white and 43.5% black. In 1972, when the Court-ordered desegregation plan was implemented, thirty percent of RPS' students were white, while seventy percent were black. In the 1984–85 school year, RPS was 86.4% black and 13.6% white. Therefore, although it is clear that the decrease in the number of whites attending public schools in Richmond occurred at a faster rate after 1954 than it did prior to 1954, it is also clear that this

trend had begun prior to that time. Accordingly, it would seem that at least part of the "white flight" from RPS cannot be attributed to desegregation. Moreover, although it is undisputed that the absolute number of white students in RPS did decline nearly every year after 1954, a significant factor in the decrease in the *percentage* of white students in RPS was the rapid increase in the absolute number of black students in the system. In 1954, for example, approximately 15,600 black students attended public schools in Richmond. In 1977, this number had nearly doubled to approximately 30,700. Therefore, although the ratio of blacks to whites in RPS did change rather dramatically between 1954 and 1972—from 43.5% black and 56.5% white in 1954 to 70.0% black and 30.0% white in 1972—a large part of this change may be attributed to an increase in the number of blacks, rather than solely to a decrease in the number of whites.[7] Plaintiffs have not contended that the increase in the number of blacks in RPS during that time period is attributable to segregation.

It is true, of course, that part of the increase in the ratio of blacks to whites in RPS between 1954 and 1972 is the result of a decrease in the number of white students in RPS. In 1954, approximately 20,000 white students attended school in RPS; by 1972, this number had declined to approximately 13,000. This decline, however, was consistent with the general trend throughout the country during that time period of whites moving out of the cities and into the suburbs. There was no indication that this nationwide suburbanization was attributable to a desire to avoid desegregated schools.

It does appear, and the Court so finds, that at least part of the past decrease in

---

6. In comparison, in 1972, approximately seventy percent of RPS' students were black. Of RPS' thirty-nine elementary schools, only two were ninety percent or greater black. Five of the fourteen middle schools were eighty percent or greater black, while two of the eight high schools were eighty percent or greater black. It is therefore apparent that racial isolation has intensified in RPS since 1972.

7. If, for example, the number of blacks in RPS had remained constant between 1954 and 1972, the ratio of blacks to whites in RPS in 1972 would only have been fifty-five percent to forty-five percent.

the number of whites in RPS may be attributed to a desire to avoid attending desegregated schools. Between 1970 and 1974—the time during which busing began to be implemented in RPS as a means of achieving desegregation—the number of white students in RPS decreased from 17,200 to 9,400. Although some of this decrease was probably part of the general trend that began as early as 1929 of decreasing numbers of whites in RPS, some portion of this decrease would clearly seem to be related to the desegregation efforts. Plaintiffs, however, have not established that this desegregation-related decrease in white students in RPS between 1970 and 1974 is presently having an effect on the number of whites currently attending school in RPS, for all, or nearly all, of the students attending school in 1974 would by this time have been graduated from the system.

The number of whites in RPS did continue to decrease after 1974. As stated above, the number of white students in RPS in 1974 was 9,400. By the 1981 school year, this number had decreased to 4,200. During this same time period, however, the number of black students in RPS had also decreased, from 30,000 in 1974 to 26,300 in 1981. Therefore, although the number of white students in RPS decreased by 5,200 between 1974 and 1981, the number of black students in RPS also declined by a comparable amount—3,700 students. This decrease in the number of both black and white students in RPS between 1974 and 1981 undermines plaintiffs' contention that the decrease in white students in RPS during that time period may be attributed either solely or primarily to desegregation-related "white flight."

Finally, the Court notes that the racial balance in RPS appears to have stabilized, for the ratio of white students to black students in RPS was nearly exactly the same in the 1984 school year as it had been in the 1981 school year. In 1981, RPS was 13.8% white and 86.2% black. In 1984, RPS was 13.6% white and 86.4% black. Similarly, the number of white students in RPS remained stable between 1981 and 1984, for there were 4,200 white students in RPS in 1981 and 4,000 white students in 1984.[8]

In sum, then, the Court concludes that, except for the period between 1970 and 1974, plaintiffs have not succeeded in establishing that the decrease in the percentage of white students attending school in RPS may be attributed to a desire to avoid attending desegregated schools. Even in regard to the 1970–1974 decrease, however, the Court finds that a significant portion of such decrease is attributable to reasons other than a desire to avoid desegregated schools. Moreover, there was no proof that such decrease is having a present effect of any significance on the racial composition of RPS.

Finally, even if plaintiffs had established that the current racial isolation in RPS is a vestige of the prior State-mandated segregation, such a circumstance would not justify the relief requested by plaintiffs. Plaintiffs contend that the State should be required to provide additional funding to RPS because improved programs would attract more white students to RPS. Plaintiffs allege that the achievement levels of black students in RPS have been adversely affected by the low percentage of white students currently in the school system. The Court finds, however, that this assertion is unsupported by, and actually contrary to, the evidence introduced at trial, for there is no correlation between the ratio of blacks to whites in RPS and the performance levels of RPS students. Moreover, in examining the performance levels of students in school districts Statewide, it is clear that performance is unrelated to racial composition.

First, in regard to RPS, it is clear that dropout rates, retention rates, percentage

---

8. The number of black students in RPS actually decreased by a greater amount during this time period than did the number of white students. In the 1981 school year, 26,300 black students were enrolled in RPS, while in 1984, this number had declined to 25,600. This 700–person decrease in the number of black students may be compared to the decrease of only 200 in the number of white students during this time frame.

of graduates continuing education and SRA achievement test scores are not dependent on the percentage of blacks in the system. The dropout rate in 1980, when the percentage of black students in RPS was 84.4%, was slightly over 12.0%, while the dropout rate in 1983, when RPS' black population was 86.0%, was approximately 7.5%. Moreover, the dropout rate in 1983 was almost exactly the same as in 1974, when the percentage of blacks in RPS was 76.0%. Similarly, the retention rate in RPS was at its worst, 13.5%, in 1977, when 81.7% of RPS' students were black. In contrast, the retention rate was 11.5% in 1983, when 86.0% of RPS' students were black. The percentage of graduates continuing education also does not depend on the percentage of black students in RPS. The percentage of graduates continuing education was approximately ten points higher in 1978 than in 1983, even though there was a slightly greater percentage of blacks in RPS in 1983 than in 1978. Finally, there is no correlation between the percentage of blacks in RPS and the SRA test scores of RPS' students. In 1973, 73.3% of RPS' students were black. In 1984, this percentage was 86.4%. In spite of this increase in the percentage of blacks in the system, however, the reading scores of RPS' fourth graders improved from the thirtieth percentile to over the fiftieth percentile during that time period. Grade eight reading scores improved from the twentieth percentile to nearly the fortieth percentile, and eleventh grade reading scores also experienced a slight improvement.

It can therefore be seen that the performance of RPS students has improved during times in which the percentage of blacks in RPS has increased. Accordingly, the Court rejects plaintiffs' contention that the current predominance of blacks in RPS adversely affects the achievement levels of RPS students.

Moreover, an examination of the performance of school divisions Statewide establishes that there is no correlation between racial composition and student achievement. In regard to dropout rates, for example, several school districts which are predominantly white have had relatively high dropout rates, while some predominantly black school districts have had low dropout rates. Fries school district, which was 88.1% white in the 1983–84 school year, had a dropout rate of 11.1% in 1983–84; similarly, Page school district, which was 86.5% white, had a dropout rate of 7.7%. In contrast, Sussex school district, which was 79.6% black, had a dropout rate of only 3.2%, while Buckingham school district, which was 60.4% black, had a similarly low dropout rate of 3.1%. It is therefore clear that racial composition is not a predicter of educational achievement in the State as a whole.

Plaintiffs also contend that increased State funding should be required because improved programs would attract more white students to RPS. The Court finds, however, that, although it would be desirable to have greater balance than currently exists in the percentages of whites and blacks in RPS, such balance is not constitutionally required. As the Supreme Court has noted, there is no substantive constitutional right to a particular degree of racial balance or mixing. *See Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971); *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 434, 96 S.Ct. 2697, 2703, 49 L.Ed.2d 599 (1976). The Court has already concluded that the imbalance in the ratio of blacks to whites in RPS is not a vestige of prior segregation. *See supra* pp. 692–694. The Fourth Circuit has noted that, once a school district implements a racially neutral system, it is under no duty to compensate for any resegregation that is not a result of official segregation. *See Riddick v. School Board*, 784 F.2d 521, 536 (4th Cir. 1986). Similarly, in the instant case, the State cannot be required to fund programs to attract more white students to RPS, for the low percentage of white students currently in RPS is not attributable to the prior State-mandated segregation.

### C. Educational Deprivation

Plaintiffs also contend that vestiges of prior State-mandated segregation remain in

RPS in the form of educational deprivation. Although no student currently attending school in RPS has ever been personally subjected to *de jure* discrimination, plaintiffs allege that RPS students are adversely affected by the past segregation in the Richmond public schools in a number of ways. First, plaintiffs contend that because many of the parents of current RPS students were educated in segregated schools, these parents have difficulty providing the necessary education-related support to their children. Second, plaintiffs allege that, because of negative perceptions about Richmond's public schools, RPS has difficulty attracting and retaining qualified teachers. Moreover, plaintiffs contend that many of the teachers who do come to RPS were themselves victimized by State-sponsored segregation, and therefore have difficulty providing effective instruction to RPS students. Finally, plaintiffs allege that many of RPS' school facilities are inferior due to past segregation.

Plaintiffs assert that the adverse effects experienced by RPS students as a result of the above influences are reflected in RPS' high dropout rates, low retention rates, low percentage of graduates continuing education, low percentage of ninth graders who graduate four years later and low scores on standardized achievement tests. The dropout rate in RPS in the 1984–85 school year was nearly 8.6%, which was not only higher than the State's average of 4.4%, but was also higher than the averages of the counties surrounding RPS—Henrico and Chesterfield—both of which had rates of 3.9%. Similarly, the retention rate in RPS in 1984–85 was 11.5%. In contrast, the State's rate was 7.0%, Chesterfield County's was 6.0% and Henrico County's was 4.0%. The percentage of graduates continuing education in RPS in 1984–85 was approximately ten percentage points lower than the State average and the averages in Chesterfield and Henrico Counties. The percentage of ninth graders who graduate four years later was 53.5% in RPS, which was more than twenty percentage points lower than the State average and approximately twenty-five percentage

points lower than the averages of Chesterfield and Henrico Counties.

The percentile rankings on the SRA national achievement tests for RPS, the State average, Chesterfield County and Henrico County for grades four, eight and eleven for 1984–85 were as follows:

|  | RPS | State | Chesterfield | Henrico |
|---|---|---|---|---|
| Grade 4 | | | | |
| Reading | 52 | 57 | 73 | 64 |
| Mathematics | 57 | 59 | 73 | 69 |
| Language Arts | 59 | 60 | 72 | 68 |
| Grade 8 | | | | |
| Reading | 39 | 55 | 68 | 57 |
| Mathematics | 50 | 68 | 77 | 70 |
| Language Arts | 47 | 58 | 69 | 59 |
| Grade 11 | | | | |
| Reading | 35 | 58 | 69 | 64 |
| Mathematics | 44 | 64 | 72 | 69 |
| Language Arts | 45 | 58 | 67 | 67 |

RPS' composite scores on the SRA tests in 1984–85 were: fourth grade—59th percentile, fifth grade—60th percentile, eighth grade—44th percentile, and eleventh grade—39th percentile.

Plaintiffs note that the scores received by RPS students are lower than the State average as well as the scores received by students in Henrico and Chesterfield Counties. Plaintiffs contend that it is legitimate to compare the scores of RPS students with those of the adjoining counties and the State average for two reasons: first, because RPS students must compete for jobs and college placements with students from other Virginia school districts in general and, most directly, with students from other schools in the Richmond metropolitan area, and second, because there is no reason to suspect that, absent past segregation, RPS students would not perform as well as students in either the surrounding counties or in the State as a whole. The Court finds, however, that neither of these assertions support the relief requested by the plaintiffs in the instant case.

Although it would admittedly be desirable to have RPS students perform as well as students in the State as a whole or in Henrico and Chesterfield Counties, equality of results is not guaranteed by the Constitution. Rather, the Constitution only re-

quires that RPS students be restored to the position they would have occupied absent the prior constitutional violation. *See, e.g., Milliken v. Bradley*, 433 U.S. at 280, 97 S.Ct. at 2757. Accordingly, the disparity in achievement between RPS students and students in the surrounding counties and the State as a whole can only support the relief requested if plaintiffs can establish that such disparity is attributable to the prior State-mandated segregation. The Court finds that plaintiffs have not met their burden of establishing that the performance levels of RPS students are attributable to such segregation.

First, the Court has serious doubt as to whether any significant deficiencies do in fact presently exist in RPS for, although RPS may have experienced some difficulties in the past, many of these problems appear to have *already* been eliminated. The performance of RPS students at all grade levels has, on the whole, improved at a steady and rapid rate over the last four years. RPS fourth and fifth graders are *currently* achieving *well above* the national average and almost exactly at the State average.[9] Since the achievement levels of individual RPS students have historically either remained constant or even increased as such students progress through the school system, it appears likely that the current fourth graders will maintain their performance levels through graduation. Further, given the steady improvement of RPS' test scores in recent years, there is no reason to suspect that the performance of future RPS students will not exceed that of those currently in the system. Accordingly, RPS appears to have already reached the point where its students can be expected to consistently equal or exceed the performance of students throughout the nation and in the State of Virginia.

To the extent that any deficiencies in the educational performance of RPS students may still remain, the Court rejects plaintiffs' contention that such difficulties are attributable to the effects of past segregation on RPS' parents, teachers and/or school facilities. First, as noted above, *see supra* pp. 690–691, the effect of the prior State-mandated school segregation on the *parents* of current RPS students may not be considered in determining whether the relief requested in the instant case is warranted. Moreover, even if such a factor could be considered, plaintiffs' contention that the parents of current RPS students are not able to adequately assist their children in preparing for school is undermined by the fact that eighty-three percent of RPS' kindergarten students scored at or above average on the 1985 readiness tests. The Court also rejects plaintiffs' contention that RPS' teachers are ineffective. An extremely high percentage of RPS' instructional personnel, 97.4%, hold college degrees. Moreover, 41.4% of such personnel hold post-graduate degrees, ranking RPS thirteenth out of the State's 135 school divisions.[10] Mayor Roy West, the current Mayor of the City of Richmond and principal of the Albert Hill Middle School testified that RPS' teachers are "excellent" and that the bad teacher is "the exception." *See* Tr. 1202–03. The Court concurs with Mayor West's assertion that it is an insult to those RPS teachers who were themselves graduated from RPS to assume that they are not capable teachers. Finally, the Court finds that plaintiffs have failed to prove their contentions regarding RPS' facilities. Plaintiffs did not introduce any evidence, other than very generalized testimony, in support of their assertion that the facilities in RPS' formerly all-black schools are currently inferior to the facilities at the formerly all-white schools. Further, plaintiffs did not establish that, even if such inferiority did exist,

---

**9.** Plaintiffs contend that the SRA scores overstate the performance of RPS students, as such scores do not account for those students who have either dropped out of school or fallen behind their grade level. Plaintiffs did not, however, introduce any evidence to indicate

how many of such students exist at the elementary level in RPS.

**10.** In contrast, Henrico County ranked 31st in the State in this category (37.3%), while Chesterfield County ranked 96th (25.1%).

it was attributable to the State's allocation of resources, rather than to RPS' decision as to how its funding should be distributed. Finally, plaintiffs did not establish that students attending school in these allegedly inferior facilities are not achieving as well as students in other RPS schools. Accordingly, the Court concludes that plaintiffs have not met their burden of proving that the achievement levels of current RPS students are being adversely affected by the effects of the prior State-mandated school segregation on RPS' parents, teachers or facilities.

The Court finds that the testimony at trial established that a large number of factors affect school performance. Two of the most important of these factors are the incidence of poverty in a particular school system and the educational philosophy of such system. RPS has a very high incidence of poverty; in 1984, for example, 51.1% of RPS' students came from low-income backgrounds. In contrast, low-income students comprised only 13.0% of Henrico's school population, and 7.3% of Chesterfield's. When RPS' test scores are compared, not to the nation as a whole, but rather to schools with a relatively high incidence of poverty, it may be seen that RPS students generally perform *better* than would otherwise be expected. When compared to schools with a high concentration of Title One students, the percentile rankings of RPS students on the 1984–85 SRA tests were as follows: fourth graders—nearly 75th percentile, fifth graders—55th percentile, eleventh graders—45th percentile.[11]

The Court concludes that the evidence introduced at trial established that a large part of the poverty in Richmond cannot be attributed to the prior school segregation, for the evidence establishes that blacks in the Richmond metropolitan area are, on the whole, highly mobile. The percentage of blacks living in Richmond's suburbs in 1980 was 35.6%. This percentage exceeds that in nearly all metropolitan areas nationwide which are comparable to Richmond in terms of size and rate of growth. Approximately twenty percent of the black households in the Richmond suburbs in 1980 had moved to the suburbs from Richmond itself between 1975 and 1980. The evidence established that the majority of the black households moving from Richmond to the suburbs were in the middle- to upper-income levels. Moreover, at the same time that many of the wealthier blacks were moving out of Richmond, there was an influx of lower-income blacks moving into the city. It may therefore be reasonably argued that the relatively high incidence of children from low-income families in RPS is attributable, not to the prior State-mandated segregation, but rather to the general trend of wealthier people moving out of the city and poorer people moving in.

None of the foregoing is intended to express a view that prior school segregation did not play a significant role in the high incidence of poverty in Richmond. Indeed, on a personal level, the Court is satisfied from its having presided over many school desegregation cases that the prior segregation, going back decades in which "black" schools were physically and culturally inferior to "white" schools had to have had a deterrent effect on the ability of the students to achieve middle- to upper-income levels. However, as stated above, *see supra* pp. 690–691, the Court simply finds that segregation-related poverty is not a factor that can be used to justify the imposition of remedial programs in a school system.

In addition to the high incidence of poverty in RPS, the Court also finds that the performance of RPS students was adversely affected by the educational philosophy followed for some time in the district. Mayor West testified that he felt that RPS' adoption of "newfangled" teaching techniques and departure from the "basics"

---

**11.** Although it is somewhat unclear, it appears that this comparison is to individual schools having high concentrations of Title One students, rather than to entire school districts. As RPS only contains two schools which would not have qualified under the applicable standard, however, this distinction would not appear to be significant.

had adversely affected the performance of RPS' students. *See* Tr. 1220–21. In contrast, neither Henrico nor Chesterfield County had deviated from basic teaching techniques in their schools. The effect of a school's educational philosophy on student performance is illustrated rather dramatically by Mayor West's own school—the Albert Hill Middle School. Mayor West became the principal at Albert Hill in 1980. Since that time, the SRA test scores of Albert Hill's eighth graders have increased markedly: reading scores increased by twenty percentage points, math scores improved by thirty percentage points and science scores rose by forty-five percentage points.[12] Mayor West testified that these improvements were primarily achieved, not through an influx of money, but rather through a change in the educational philosophy followed by the school. Accordingly, the Court finds that a large part of the disparity between the achievement levels of students in RPS and those of students in the State as a whole and in Henrico and Chesterfield Counties is attributable to the high incidence of poverty in RPS and to the ineffective educational philosophy that was followed for some time in the district.

In conclusion, then, plaintiffs have simply failed to establish that, absent the prior State-mandated segregation, RPS students would be performing at higher levels than they currently do. It is true that many students in other, more integrated school districts perform better than do RPS students. However, it is also true that many students in more integrated school districts perform worse than do RPS students. In sum, RPS students perform better than some Virginia students and worse than others. Plaintiffs have not satisfied the Court that, absent the prior State-mandated segregation, RPS students would be achieving at higher levels than they presently do.

Moreover, even if the burden was on the defendants to prove that no vestiges of the prior segregation remain in RPS in the form of either racial isolation or educational deprivation, the Court finds that the evidence establishes that, at the very least, nearly all of the isolation and deprivation that is alleged to exist in RPS is attributable to factors unrelated to the prior segregation.

## V. CURRENT PROGRAMS AND FUNDING

■ Finally, the Court concludes that, even if the racial isolation and educational deprivation that are alleged to exist in RPS are, at least in part, vestiges of prior State-mandated segregation, the amount of such isolation and deprivation which could be attributed to the segregated schools is fractional. Accordingly, the programs which are currently offered in RPS and the amount of funding which the State currently provides for such programs appear, from the evidence presented to the Court, sufficient to satisfy the State's constitutional obligation to eliminate such vestiges.

### A. Programs

It is clear that RPS currently offers a high-quality educational program for all its students. In 1983, Richmond reported a pupil-teacher ratio of 15.1 to 1 at the elementary level and 11.2 to 1 at the secondary level.[13] This pupil-teacher ratio was lower than that in Henrico County (16.3:1 elementary, 14.8:1 secondary), Chesterfield County (18.4:1 elementary, 13.8.1 secondary) and the State as a whole (16.9:1 elementary, 14.1:1 secondary). Similarly, RPS' administrative staffing ratio is much lower than that in the surrounding counties or the State as a whole. The ratio of teachers to instructional support staff in

---

**12.** It is true that SRA scores improved in general in RPS during this time period. The improvement at Albert Hill, however, was noticeably greater than the improvement in the district as a whole.

**13.** The pupil-teacher ratio in RPS is thus already lower than that which has been ordered as the

*goal* in cases in which remedial and compensatory relief has been ordered as a means of combating the vestiges of past discrimination. *See Liddell v. State of Missouri,* 731 F.2d at 1316 (pupil-teacher ratio of 20:1); *Jenkins v. State of Missouri,* at 29 (pupil-teacher ratio of 22:1 in grades K–3 and 27:1 in grades 4–6).

RPS in the 1983–84 school year was 10.4:1. In contrast, the State average was 12.2:1, while the ratios in Chesterfield and Henrico were 13.8:1 and 12.5:1, respectively. RPS' ratio of teachers to administrative and service support staff was 1.6:1. The State average was 2.4:1, while Henrico's ratio was 2.8:1 and Chesterfield's was 2.3:1. Finally, the ratio of pupils to total support staff was significantly lower in RPS—19.2:1—than in the surrounding counties and the State as a whole. The ratio was 32.6:1 in Chesterfield, 36.0:1 in Henrico and 31.9:1 in the State overall.[14]

In addition to its low staffing ratios, RPS also provides an impressive array of programs for those students in need of remedial instruction. The remedial programs offered by RPS include the following:

1. A full-time kindergarten program for all students commencing at age five;

2. two pre-kindergarten programs which currently serve a total of approximately 650 four year olds;

3. four separate year-round remedial programs to aid students who are experiencing educational difficulties:

(a) the PEP–UP program, which helps strengthen basic reading and math skills of third graders;

(b) the Pre-Middle Program, which provides aid in reading and math to fifth grade students performing two years below grade level;

(c) the Pre-High Program, which provides instruction in language arts, reading, math, social studies, science and the use of sources to eighth graders; and

(d) the Extended Day Remedial program for students in grades six through twelve, which provides instruction in remedial reading, math, science, social studies and the use of sources.

In addition to these remedial programs, RPS also offers several programs to reduce the truancy rate and the number of dropouts in the district. The Truancy Prevention Program consists of three truancy centers which are intended to return out-of-school youth to school and reduce the dropout rate. RPS also provides an In-School Suspension Program, which is designed to provide an alternative to out-of-school suspension and emphasizes rehabilitation of students for normal classrooms. Finally, RPS offers a Community/School Comprehensive Dropout Prevention Program, which consists of a number of different programs designed to address the problem of dropouts in different contexts.

In sum, then, the Court concludes that RPS currently provides a high quality education to all its students. Moreover, the system currently offers an extensive array of programs for those students in need of remedial aid. Dr. Harrison-Jones, the current Superintendent of RPS, testified that every child currently attending school in RPS who has been identified as reading below grade level is presently receiving some form of remedial attention. *See* Tr. 380.

### B. Funding

The Court also finds that, even if some vestiges of segregation did remain in RPS, the amount of funding currently provided to RPS by the State would be sufficient to satisfy the State's constitutional obligation. The amount of State aid per pupil provided to RPS is higher than the State average and the amount provided to either Henrico or Chesterfield County. Moreover, the State also allocates more federal funding to RPS than it does to Henrico, Chesterfield or the average State district.

State aid to school districts is divided into two categories: equalized funding and unequalized funding. Equalized funding is allocated according to the locality's ability to raise revenues to support its schools and the number of children in the district eligible to attend school. Under this formula,

---

14. The ratio of guidance counselors to elementary students in RPS is also very low. RPS has approximately one counselor for every 350 elementary school students. *See* Tr. 247. In contrast, the court in *Jenkins v. Missouri* ordered a ratio of 1 counselor for every 1,500 elementary students. *See* at 28.

then, wealthier districts receive less State aid than do poorer districts. Because Richmond is a wealthy school district, due to its high real estate tax base, RPS receives a relatively low amount of equalized funding. In the 1985–86 school year, for example, Richmond received $591 per pupil in equalized State funding, while Henrico received $692 and Chesterfield received $904. The State average was $808.

In contrast to equalized funding, however, unequalized funding is distributed, not on the basis of the district's wealth, but rather on the basis of certain "programmatic data." The amount of unequalized funding that RPS receives exceeds both the State average and the amounts allocated to Henrico or Chesterfield. Richmond received $1,117 per pupil in the 1985–86 school year. The State average was $812, while Henrico and Chesterfield received $852 and $692, respectively.

When equalized and unequalized funding are considered together, RPS received more of such funding than Henrico, Chesterfield or the State average. The State average in 1985–86 was $1,623. Richmond received $1,709, while Henrico received $1,550 and Chesterfield received $1,596.

In addition to equalized and unequalized funding, the State has also provided aid specifically for remedial education. The statistics for the last six years are as follows:

|  | RPS | Henrico | Chesterfield |
| --- | --- | --- | --- |
| 1980–81 | $552,453 | $39,000 | $31,000 |
| 1981–82 | 543,003 | 39.000 | 31,000 |
| 1982–83 | 1,085,200 | 142,245 | 80,325 |
| 1983–84 | 1,132,917 | 145,590 | 82,110 |
| 1984–85 | 828,606 | 60,652 | 46,774 |
| 1985–86 | 935,504 | 74,340 | 57,830 |

As can be seen, RPS has consistently received far greater amounts of remedial funding from the State than has either Henrico or Chesterfield.

Finally, as noted above, *see supra* p. 686, the State has also allocated large amounts of federal funding to RPS. The amount of federal funding received by RPS far exceeds the amounts allocated to either Henrico or Chesterfield County. In the years 1981, 1982 and 1983, RPS received a total of $353, $355 and $355 per pupil respectively. During those same years, Henrico received $72, $62 and $83, while Chesterfield received $79, $61 and $68.

It is therefore clear that the State already provides RPS with a disproportionately large amount of funding. Except for equalized funding, which is distributed on the basis of the district's wealth, the amount of State and Federal aid received by RPS far exceeds the State average and the amounts received by Henrico or Chesterfield Counties. Although these funds are not explicitly designated as being for the purpose of eliminating the vestiges of past discrimination, they would certainly have the effect of helping those students who are in need of remedial education. Accordingly, such funds would necessarily have the effect of eliminating what plaintiffs contend are the vestiges of the prior segregation. Since such vestiges are, at most, minimal, the Court finds that the amount provided by the State is sufficient to satisfy whatever remaining constitutional obligation the State may have.[15]

### Conclusion

Plaintiffs' claim in the instant case is that the State is constitutionally required to provide additional funding to the Richmond Public School System to eliminate the vestiges of past State-mandated segregation. Whether the State should have been required to provide such finding in 1972, when the desegregation plan was first implemented, is an issue not presently before

---

**15.** It appears that, over the last ten years, the State has provided approximately ten percent as much money for compensatory and remedial programs in RPS as has RPS itself. The Court finds that this percentage exceeds the extent to which any racial isolation or educational deprivation that may currently exist in RPS is attributable to prior State-mandated segregation. Since the Court has found, however, that no vestiges of prior State-imposed segregation remain in RPS, the State is not constitutionally required to provide any amount of funding to RPS, at least insofar as such funding constitutes compensation for prior segregation. The State would not of course be free to discriminate against RPS in regard to funding on the basis of RPS' racial composition.

the Court. The Court finds that plaintiffs' claim must fail, for plaintiffs have not established that any vestiges of the prior State-mandated segregation in the Richmond public schools continue to remain in RPS. No student currently attending school in RPS has ever been personally subjected to *de jure* segregation. RPS' elementary students are already performing well above the national average on the SRA tests and are nearly equaling the State average. Given the past performance of RPS students, it would appear that these students will maintain their performance levels throughout graduation and that future RPS students will attain even higher levels of achievement. Moreover, even if some minimal vestiges of the prior State-mandated segregation did exist in RPS, the amount of funding currently provided to RPS by the State would be sufficient to satisfy the State's constitutional obligation. Accordingly, plaintiffs' claim shall be denied.

The Court emphasizes the limited nature of its holding in the instant case. Plaintiffs' claim was only that vestiges of the past *State-mandated segregation* remain *in the Richmond Public School System.* The Court does not hold that RPS in its current state is completely unaffected by any discrimination, past or present. Instead, the Court's holding only encompasses the effects of past *State-mandated segregation,* for the Court only has the authority to order the State to pay for those conditions for which the State is responsible. Accordingly, the State cannot be required to provide funding to alleviate conditions that may be attributable to other sources, such as discrimination by private persons or discrimination resulting from acts by other governmental bodies. Similarly, the Court does not hold that the effects of the prior State-mandated segregation have been eliminated in *every* context. Rather, the Court only holds that there are no vestiges of the prior State-mandated segregation in the Richmond Public School System.

Finally, the Court concludes that RPS has now achieved unitary status. The Court shall therefore relinquish its jurisdic-

tion over the Richmond Public School System.

The Court commends the Richmond Public School System for the exemplary efforts and progress it has made since 1972.

An appropriate order shall issue.

### FINAL ORDER

For the reasons stated in the accompanying memorandum entered this day, and deeming it just and proper so to do, it is ADJUDGED and ORDERED that plaintiffs' claim that the Commonwealth of Virginia is constitutionally required to provide additional funding to the Richmond Public School District to eliminate the vestiges of the past State-mandated segregation be and the same is hereby DENIED.

The Court also finds that the Richmond Public School District has now achieved unitary status. The Court therefore relinquishes its jurisdiction over the School District, and this case stands DISMISSED. Defendants are entitled to their taxable costs.