**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-2312**
_____

RONDA EVERETT; MELISSA GRIMES; CAROLINE SUTTON; CHRISTOPHER
W. TAYLOR, next friends of minor children attending Pitt
County Schools; PITT COUNTY COALITION FOR EDUCATING BLACK
CHILDREN,

        Plaintiffs – Appellants,

    and

JUVENILE FEMALE 1; THE GREENVILLE PARENTS ASSOCIATION,

        Intervenors/Plaintiffs,

    v.

PITT COUNTY BOARD OF EDUCATION, public body corporate,

        Defendant – Appellee.

_____

Appeal from the United States District Court for the Eastern
District of North Carolina, at Greenville.  Malcolm J. Howard,
Senior District Judge.  (6:69-cv-00702-H)

_____

Argued: December 9, 2014        Decided: June 3, 2015

_____

Before NIEMEYER, WYNN, and DIAZ, Circuit Judges.

_____

Affirmed by published opinion.  Judge Diaz wrote the majority
opinion, in which Judge Niemeyer joined.  Judge Wynn wrote a
dissenting opinion.

_____

**ARGUED**: Mark Dorosin, UNIVERSITY OF NORTH CAROLINA CENTER FOR CIVIL RIGHTS, Chapel Hill, North Carolina, for Appellants. Kenneth Alexander Soo, THARRINGTON SMITH LLP, Raleigh, North Carolina, for Appellee. **ON BRIEF**: Ezra D. Rosenberg, Princeton, New Jersey, Lauren Kurtz, New York, New York, C.B. Buente, DECHERT LLP, Washington, D.C.; Brenda Shum, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C., for Appellants. Deborah R. Stagner, THARRINGTON SMITH LLP, Raleigh, North Carolina, for Appellee.

---

DIAZ, Circuit Judge:

This appeal arises from two desegregation orders entered in 1970 by the United States District Court for the Eastern District of North Carolina. The district court determined then that the Greenville City and Pitt County Boards of Education were operating racially segregated schools and directed them to submit desegregation plans that would establish a nonracial, unitary school district. Following the school boards' initial compliance with the orders, the cases were administratively closed and lay dormant for over thirty-five years.

In 2008, a dispute arose between the Pitt County Board of Education (the "Board")[1] and the Greenville Parents Association (the "Association") concerning the Board's explicit consideration of race when devising student assignment plans. The parties ultimately settled, and the district court entered a consent order approving the settlement and directing the parties to work together toward attaining unitary status for the school district.

Three years later, a group of parents and the Pitt County Coalition for Educating Black Children ("Plaintiffs") moved to enjoin the implementation of the Board's 2011-12 student

---

[1] By this date, the Greenville City and Pitt County schools had been consolidated into a single school district.

3

assignment plan, arguing that it failed to move the school district toward unitary status. The district court denied relief, but we vacated that ruling, holding that the district court erred when it failed to place the burden on the Board to show that the 2011-12 student assignment plan moved the school district toward unitary status. On remand, the Board filed a motion requesting that the district court declare the school district unitary. After a five-day bench trial, the district court granted the Board's motion and dismissed Plaintiffs' request for an injunction as moot.

We conclude that the district court acted within its discretion in choosing to address the Board's motion for declaration of unitary status before ruling on Plaintiffs' motion for injunctive relief. And because the court did not clearly err in determining that the school district is unitary, we affirm.

I.

A.

In January 1965, a group of plaintiffs representing black students filed suit against the Pitt County Board of Education, alleging that the board unlawfully operated and maintained racially segregated schools. Teel v. Pitt County Board of Education, No. 6:65-CV-569 (E.D.N.C. filed Jan. 4, 1965). The

4

district court entered an injunction restraining the Board from refusing admission, assignment, or transfer of any student on the basis of race. The Board attempted to comply with the court order by adopting a freedom-of-choice plan, which allowed students to choose the school they wished to attend. The plan, however, resulted in only a small percentage of black students attending predominantly white schools. As a result, the district court rejected it, ruling that it failed to advance the Board's constitutional duty to establish a unitary school district. It took several more years for the Board to devise a desegregation plan that met with the district court's approval.

A separate but substantially similar action came before the district court in November 1969. Like Teel, Edwards v. Greenville City Board of Education, No. 6:69-CV-702 (E.D.N.C. filed Nov. 12 1969), involved representatives of black students asking the district court to enjoin the Greenville City school board's continued operation of a racially segregated school system. Again, the district court granted the injunction. The court rejected the board's first proposed desegregation plan and ordered it to submit a plan that achieved racial integration in not only student assignment, but also faculty and staff assignment, extracurricular activities, and transportation. Shortly thereafter, the board submitted an amended plan that met with both the plaintiffs' and the court's approval.

The district court continued to monitor the progress of the desegregation plans until January 1972, when it issued orders determining that the cases had been decided on the merits and removed them from the pending docket, subject to being reopened as circumstances warranted. The cases remained administratively closed for thirty-five years. In the meantime, the two school districts merged in 1986 and their separate boards of education were replaced by a single, consolidated Board.

The consolidated Board sought to reopen Teel and Edwards in 2008. The impetus was the Board's adoption, three years earlier, of a new student assignment plan for the 2006-07 academic year.[2] Under the then-existing attendance area policy, the assignment plan considered students' race, with the goal of achieving a 70/30[3] racial balance in each school. To achieve this balance, the new plan relied on satellite attendance areas[4] and busing.

---

[2] Only schools within the Greenville city limits were subject to the 2006-07 student assignment plan.

[3] By 70/30 racial balance, the Board intended no school to have more than a seventy percent white or black population and no less than a thirty percent black or white population.

[4] Satellite attendance areas are created by attaching "relatively homogenous neighborhoods of mostly one race" to "non-contiguous school zones some distance away that need[] that race for racial balance." J.A. 802.

Objecting to the explicit use of race in student assignment, the Association filed a discrimination complaint with the United States Department of Education Office for Civil Rights (the "OCR"). While the complaint was pending, the Board revised its attendance area policy, adding student achievement and socioeconomic status as factors that, along with race, the Board would consider when establishing student attendance areas.

Ultimately, the Board and the OCR settled the complaint. The settlement required the school district to seek a ruling from the district court as to whether the desegregation orders in Teel and Edwards authorized the Board to consider race in its student assignment plan. In accordance with the settlement, the Board asked the district court to approve its 2006-07 student assignment plan as well as its revised attendance area policy.

In response, the district court reopened and consolidated Teel and Edwards and re-captioned the new action under its current name. In addition, the court allowed the Association to intervene. The Association then asked the district court to reject both the 2006-07 student assignment plan and the revised attendance area policy, and instead declare the school district unitary. Plaintiffs joined the Board in opposing the motion.

After court-ordered mediation, the parties reached a settlement. The Board agreed to involve Plaintiffs and the Association in developing the next student assignment plan. In

exchange, the Association withdrew its motion for a declaration of unitary status, and consented to the Board's motion for approval of the 2006-07 student assignment plan and the revised attendance area policy. The parties also "pledge[d] to work together to achieve" unitary status for the school district. J.A. 195.

The district court approved the settlement and entered a consent order in November 2009. The court's order directed "the parties to work toward attaining unitary status so that the court may relinquish jurisdiction over this case and restore to the School Board full responsibility for the operation of its schools." J.A. 204.

B.

In 2010, the Board began developing a student assignment plan for the 2011-12 school year to accommodate the opening of a new elementary school and the closing of an existing one. The Board worked with the Operations Research and Education Laboratory of North Carolina State University ("OREd")[5] to draw up proposed attendance area maps. In designing the maps, the Board and OREd considered: (1) students' proximity to their

---

[5] OREd "is a non-profit organization that provides school districts with scientific tools to project future enrollment, to evaluate utilization of existing school facilities, to locate placement of new schools, and to develop attendance boundaries." J.A. 492.

8

assigned schools; (2) building capacity; (3) academic proficiency; and (4) impact area[6]. Notably, academic proficiency was the sole diversity input factor the Board used when designing the maps, even though the Board's attendance area policy permitted it to consider student race.

The Board invited the Association and Plaintiffs to attend two workshop retreats to solicit their input regarding the proposed maps. During the first retreat, the Board presented two proposals. The first proposed map considered only student proximity and school capacity in developing attendance boundaries ("Scenario 1"). This map resulted in an increase in racially identifiable schools, with six impacted schools falling short of the Board's target student proficiency index. The second proposed map factored in student proficiency along with proximity and school capacity ("Scenario 2"). It resulted in increased student diversity, and a greater balance of student proficiency levels across the impacted schools. Scenario 2, unlike Scenario 1, required the use of satellite attendance areas and busing.

After receiving input from the parties, the Board directed OREd to generate a new map. This map ("Scenario 3") aimed to

---

[6] Impact area refers to the location and number of school attendance areas affected by the reassignment plan.

limit satellite attendance areas, but still considered student proficiency in an attempt to increase diversity. The proposed map was then further modified based on community input. The final Scenario 3 map resulted in schools that were more racially diverse than in Scenario 1, but less diverse than Scenario 2. It also required fewer satellite attendance areas than Scenario 2. Over Plaintiffs' objections, the Board adopted the Scenario 3 map as its 2011-12 student assignment plan.

Plaintiffs moved to enjoin the implementation of the 2011-12 plan, arguing that it created racially identifiable schools and failed to move the district toward unitary status. The district court denied the motion, ruling that Plaintiffs "ha[d] not demonstrated a likelihood of success on the merits of their claim so as to justify the extraordinary relief they request[ed]." Everett v. Juvenile Female 1, No. 6:69-CV-702-H, 2011 WL 3606539, at *2 (E.D.N.C. Aug. 16, 2011).

On appeal, we vacated the district court's ruling and remanded. We found that:

> Given that there is no dispute that the school district has not attained unitary status, the evidentiary burden should have been on the School Board to prove that the 2011-12 Assignment Plan is consistent with the controlling desegregation orders and fulfills the School Board's affirmative duty to eliminate the vestiges of discrimination and move toward unitary status.

10

Everett v. Pitt Cnty. Bd. of Educ., 678 F.3d 281, 290 (4th Cir. 2012).

When the case returned to the district court, the Board moved for a declaration of unitary status. After a five-day bench trial, the district court ruled for the Board. It found that, even before the 1986 merger, both Pitt County and Greenville City schools were unitary with respect to student assignment. The court also found that the consolidated school district was now unitary in terms of faculty and staff assignment, facilities, transportation, and extracurricular activities.

The Board, said the district court, had proven that "the vestiges of state-mandated discrimination practiced over forty years ago have been eliminated to the extent practicable and that the School Board, as well as its predecessor boards, has complied in good faith with this court's desegregation orders." Everett v. Pitt Cnty Bd. of Educ., No. 6:69-CV-702-H, slip op. at 42 (E.D.N.C. Sept. 25, 2013). Because the school district was unitary in all respects, the court denied Plaintiffs' motion for injunctive relief as moot. This appeal followed.

II.

A.

11

In Brown v. Board of Education, 347 U.S. 483 (1954) (Brown I), the Supreme Court held that laws mandating racial segregation in public schools violate the Equal Protection Clause of the Fourteenth Amendment. A year later, the Court ordered those school boards operating racially segregated school systems to "effectuate a transition to a racially nondiscriminatory school system." Brown v. Bd. of Educ., 349 U.S. 294, 301 (1955) (Brown II). The federal district courts were tasked with undertaking "such proceedings and enter[ing] such orders and decrees" as necessary to desegregate school districts with "all deliberate speed." Id.

Thirteen years later, the Court clarified that the "transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about" by Brown II. Green v. Cnty. Sch. Bd. of New Kent Cnty., 391 U.S. 430, 436 (1968). School boards operating "dual systems," whereby black children attend black schools and white children attend white schools, retained "the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Id. at 437-38.

Generally, courts "have used the terms 'dual' to denote a school system which has engaged in intentional segregation of students by race, and 'unitary' to describe a school system

12

which has been brought into compliance with the command of the Constitution." Bd. of Educ. of Okla. City Pub. Schs. v. Dowell, 498 U.S. 237, 246 (1991). However, the Supreme Court has declined to give the term "unitary" a "fixed meaning or content." Freeman v. Pitts, 503 U.S. 467, 487 (1992). Rather, the Court has left it to district courts overseeing the desegregation process to determine when a school district "no longer discriminates between children on the basis of race." Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305, 318 (4th Cir. 2001).

In making this determination, a district court considers "whether the Board [has] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination [have] been eliminated to the extent practicable." Dowell, 498 U.S. at 249-50. Only when it is satisfied that a school district is operating a unitary system may the court dissolve a desegregation order, thereby relinquishing its supervisory authority over the school district. See id. at 246 ("If [a desegregation] decree is to be terminated or dissolved, respondents as well as the school board are entitled to a like statement from the court."); Riddick by Riddick v. Sch. Bd. of Norfolk, 784 F.2d 521, 530 (4th Cir. 1986) ("[The district court] is required to retain jurisdiction

13

until it determines that the school system has become unitary.").

The district court's "end purpose must be to remedy the violation and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." Freeman, 503 U.S. at 489. Indeed, "[r]eturning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system." Id. at 490.

B.

With these principles in mind, we consider the merits of Plaintiffs' legal challenges. We first address Plaintiffs' claim that the Board was estopped from seeking a retroactive declaration of unitary status given its "numerous judicial admissions . . . that it had not attained unitary status at any time prior to 2009."[7] Appellant's Br. at 36. We reject this contention.

---

[7] Plaintiffs and the dissent assert (incorrectly) that the district court determined that the school district was unitary as of the mid-1980s. In fact, the court found that the two then-separate districts were unitary only as to student assignment, see Everett v. Pitt Cnty. Bd. of Educ., No. 6:69-CV-702-H, slip op. at 20, 23 (E.D.N.C. Sept. 25, 2013), which was not sufficient to support a declaration of unitary status. The court implicitly recognized this fact, as it went on to conclude that the school district remained unitary with respect to student assignment after the merger, and then conducted a thorough examination of the remaining Green factors. Yet, by
(Continued)

14

A judicial admission is a representation made by a party that, "unless allowed by the court to be withdrawn, is conclusive in the case." Meyer v. Berkshire Life Ins. Co., 372 F.3d 261, 264 (4th Cir. 2004) (quoting Keller v. United States, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995)). Judicial admissions "go to matters of fact which, otherwise, would require evidentiary proof." New Amsterdam Cas. Co. v. Waller, 323 F.2d 20, 24 (4th Cir. 1963). In addition, judicial admissions "include intentional and unambiguous waivers that release the opposing party from its burden to prove the facts necessary to establish the waived conclusion of law." Minter v. Wells Fargo Bank, N.A., 762 F.3d 339, 347 (4th Cir. 2014) (internal quotation marks omitted). A purported judicial admission is binding only if the statement is "deliberate, clear, and unambiguous." Id.

Included among the statements that Plaintiffs rely on as examples of judicial admissions are the Board's statements in its motion for approval of the 2006-07 student assignment plan and revised attendance area policy that the school district "was

determining that Plaintiffs' motion to enjoin the 2011-12 student assignment plan was moot, the district court necessarily found--even if it did not say so expressly--that the school district was unitary at the time of the implementation of the 2011-12 plan. As we explain, however, we do not think this problematic.

15

permitted to consider racial balance in student assignment under Edwards and Teel," and could "adopt a racial balance ratio and otherwise . . . consider race as a factor" in its student assignment plans. J.A. 90, 93, 95. Plaintiffs also cite the Board's motion in support of the 2009 consent order in which the Board acknowledged that "the Proposed Consent Order would not dispose of the unitary status issue once and for all." J.A. 178.

These statements, however, merely acknowledged the judicial reality on the ground, i.e. that the school district remained subject to the district court's desegregation orders until the court declared the schools unitary. They fall far short of deliberate, clear, and unambiguous admissions that the Board continued to operate a dual school district.

In any event, Plaintiffs' contention suffers from a more fundamental flaw. Simply put, whether a school district is unitary is not something that can be judicially admitted (or denied); rather, it is entirely the province of the district court to decide the issue. This conclusion is compelled by our decision in Belk.

There, the school board insisted to the district court that it "had not pursued the dismantlement of the dual system with the requisite zeal." Belk, 269 F.3d at 333. The court nonetheless declined to defer to the board's claim that its

16

school district was not unitary.  Indeed, it highlighted several reasons why the board might have wanted to remain subject to the desegregation orders, including avoiding the "long, drawn-out process" and expense involved with a unitary status hearing, fears that it might lose eligibility for certain federal funding should it be declared unitary, and a desire to continue racially balancing its schools.  Id.  We approved of the district court's finding on this issue, concluding that a school board's representation that it is not unitary may reflect the self-interested desire of a board to use a desegregation order as a "mechanism[] for the attainment of different goals."  Id. at 334.

Consequently, even if the Board in this case had admitted that it continued to operate a dual school district, the district court was under no obligation to treat the Board's statements as conclusive in deciding whether the school district was unitary.

C.

Plaintiffs next contend that the district court violated the "law of the case" by considering the unitary status question before first deciding whether the 2011-12 student assignment plan moved the school district toward that status.  The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues

17

in subsequent stages in the same case." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)). Once a court has established the law of the case,

> it must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal . . . unless: (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.

United States v. Aramony, 166 F.3d 655, 661 (4th Cir. 1999) (internal quotation marks omitted). Because we find the first exception applicable here, we reject Plaintiffs' contention.

According to Plaintiffs, we established the law of the case during the first appeal when we directed the district court to place the evidentiary burden on the Board "to prove that the 2011-12 Assignment Plan is consistent with the controlling desegregation orders and fulfills the School Board's affirmative duty to eliminate the vestiges of discrimination and move toward unitary status." Everett, 678 F.3d at 290. Plaintiffs say that the district court's finding that the school district was already unitary at the time of the implementation of the 2011-12 student assignment plan effectively ignores our prior holding.

When we first considered this case, however, the only issue decided by the district court was whether the 2011-12 student assignment plan was consistent with the Board's obligation to

18

work toward attaining unitary status. On remand, the Board moved for just such a declaration. In response, the district court held a trial during which the parties, for the first time, presented evidence on that issue. Once the district court took evidence on the question, it was no longer bound by the law of the case, but was instead free to determine whether the school district was unitary. Accordingly, we find no error in the manner in which the district court elected to address the issues before it.

### D.

We turn now to the heart of Plaintiffs' challenge to the process by which the district court resolved this case. In essence, Plaintiffs contend that the Board first had to prove that the 2011-12 student assignment plan moved the school district toward unitary status before the district court could declare the schools unitary. Plaintiffs say that by flipping the issues--that is, by first declaring the schools unitary and then refusing, on mootness grounds, to assess the merits of 2011-12 student assignment plan--the district court improperly gave the unitary status determination retroactive effect. We do not agree.

### 1.

Plaintiffs contend that a declaration of unitary status is effective only as of the date it is issued. Therefore, until

19

September 25, 2013 (the date of the district court's order declaring the school district unitary), any Board action had to be consistent with its obligations under the desegregation orders, and the later 2009 consent order. By deciding the unitary status issue before evaluating the 2011-12 student assignment plan, Plaintiffs say that the district court made an unlawful retroactive declaration of unitary status.

It is of course true that, until declared unitary, a school district retains a continuing duty to work toward eliminating the vestiges of its past discrimination. Riddick, 784 F.2d at 535; Vaughns by Vaughns v. Bd. of Educ. of Prince George's Cnty., 758 F.2d 983, 988 (4th Cir. 1985) ("Until a school system has discharged its duty to liquidate the dual system and replace it with a unitary one, the school's duty remains in place."). Whether a school district has eliminated the vestiges of discrimination is judged against what are known as the Green factors. See Green v. Cnty. Sch. Bd. of New Kent Cnty., 391 U.S. 430 (1968). Under Green, "a school district has achieved unitary status when it is devoid of racial discrimination in regard to faculty, staff, transportation, extracurricular activities, facilities, and pupil assignment." Sch. Bd. of Richmond v. Baliles, 829 F.2d 1308, 1312 (4th Cir. 1987).

A dual school district operates under a presumption "that current disparities are causally related to prior segregation,

20

and the burden of proving otherwise rests on the [school board]." Id. at 1311. That presumption, however, ends when the school has achieved unitary status, at which point the burden of proof shifts back to the plaintiffs "to prove discriminatory intent on the part of the school board of a unitary school [district]." Riddick, 782 F.2d at 537.

Importantly, the burden of proof shifts, not when the school district is declared unitary, but when the district court determines it first achieved that status. This proposition is exemplified by our decision in School Board of Richmond v. Baliles. In that case, after a court-ordered freedom-of-choice plan proved unsuccessful, the district court ordered the School Board of the City of Richmond to implement a desegregation plan that "required extensive busing of students, proximal geographic zoning, pairing, clustering, satellites and racial balance among faculty." Bradley v. Baliles, 639 F. Supp. 680, 682 (E.D. Va. 1986).

Twelve years later, the board came before the district court asking to be realigned as plaintiffs and to have certain state officials, including the Governor of Virginia, joined as defendants. It argued that Virginia had "engaged in various activities which contributed to the segregation that existed in" Richmond Public Schools. Id. Consequently, the board "sought to compel the state to fund remedial and compensatory programs

21

to eliminate the lingering effects of the state's former dual system." Baliles, 829 F.2d at 1310.

The district court found that Richmond Public Schools had achieved unitary status sometime between 1972 and 1986. Bradley, 639 F. Supp. at 687. Because the school district had become unitary, the court concluded that the burden had shifted to the board to prove that any vestiges of past state-mandated segregation remained in Richmond Public Schools. Id. at 689. The court then proceeded to address and deny the board's request for relief.

On appeal, we affirmed the district court's shifting of the burden. Baliles, 829 F.2d at 1312. Thus, Baliles demonstrates that a district court may assess unitary status before addressing the request for relief that brought the plaintiff before the court in the first place. This is true, even though the declaration may weaken (or even eliminate) the plaintiff's claim for relief.

The only authority that Plaintiffs cite in support of their claim that a unitary status determination cannot relate back is Capacchione v. Charlotte-Mecklenburg Schools, 57 F. Supp. 2d 228, 285 (W.D.N.C. 1999), aff'd in part, rev'd in part by Belk, 269 F.3d 305. There, the district court stated that "the termination of court supervision today cannot 'relate back' to an earlier time." Id. However, in context, that statement was

part of a larger discussion on whether school officials acting pursuant to a court's desegregation order enjoyed immunity from damages. Indeed, the court held that the school district "was still under court order [and there was] no legal basis for a finding of de facto unitary status that would abrogate [the district's] immunity retroactively." Id.

This, of course, must be the case given the "well-established insistence that those who are subject to the commands of an injunctive order must obey those commands." Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 439 (1976). It follows that school officials, acting pursuant to their obligations under a desegregation order, cannot be held liable for damages on account of those actions. However, Capacchione has little relevance here, where the court's "retroactive" unitary status declaration merely shifts the burden of proving discriminatory intent.

2.

The district court's decision to assess unitary status first comports with its obligation to "restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." Freeman, 503 U.S. at 489. The Supreme Court has repeatedly emphasized that district court supervision is a "temporary measure." Id.; Dowell, 498 U.S. at 247; see also Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 410

23

(1977) ("[O]ur cases have . . . firmly recognized that local autonomy of school districts is a vital national tradition."); Milliken v. Bradley, 418 U.S. 717, 741 (1974) ("No single tradition in public education is more deeply rooted than local control over the operation of schools . . . ."). It would be anathema to the goal of quickly and efficiently returning a school district to local control if the district court were required to ignore its conviction that the Pitt County school district is unitary, and instead analyze the 2011-12 student assignment plan through a prism of state-mandated segregation that no longer exists.

We recognize that the district court declined altogether to entertain Plaintiffs' request for injunctive relief, finding that "an order enjoining the continued implementation of this plan would be pointless since the school district has been declared unitary and no longer has an affirmative duty to ensure that its policies move the district toward unitary status." Everett v. Pitt Cnty. Bd. of Educ., No. 6:69-CV-702-H, slip op. at 40-41 (E.D.N.C. Sept. 25, 2013). Still, if Plaintiffs had made credible allegations that the Board was taking intentionally segregative actions, an injunction should nonetheless issue. But here, Plaintiffs' request to enjoin the 2011-12 student assignment plan depends entirely on their allegation that the plan "moves the district further from

24

unitary status." J.A. 214. Because the district court held that the school district was unitary at the time of the plan's implementation (and has remained so), it did not err in dismissing Plaintiffs' motion for injunctive relief as moot.

## III.

### A.

Having determined that the district court did not err in the manner in which it addressed the issues before it, we now reach the merits of its finding that the school district is unitary. We review this determination for clear error. Belk, 269 F.3d at 317. "A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed." Id. at 317-18 (quoting Faulconer v. Comm'r, 748 F.2d 890, 895 (4th Cir. 1984)). We may not overturn the district court so long as its "unitary status determination rests on a permissible view of the evidence," even if we might have ruled differently had we been sitting as the trier of fact. Id. If the "district court's account of the evidence is plausible in light of the record viewed in its entirety," then we must affirm. Id. at 319 (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985)).

The test for determining whether a school district is unitary is twofold. The district court must find that the school district has "complied in good faith with the desegregation decree since it was entered," and it must be satisfied that "the vestiges of past discrimination [have] been eliminated to the extent practicable." Dowell, 498 U.S. at 249-50. We have said previously that "[i]mplicit in the . . . term 'practicable' is 'a reasonable limit on the duration of federal supervision.'" Belk, 269 F.3d at 318 (quoting Coal. to Save Our Children v. State Bd. of Educ., 90 F.3d 752, 760 (3d Cir. 1996)) (alteration omitted).

When deciding whether a school district has eliminated the vestiges of past discrimination, the district court considers the six Green factors: student assignment, faculty assignment, staff assignment, transportation, extracurricular activities, and facilities. See Belk, 269 F.3d at 318-19 (citing Green, 391 U.S. at 435). In addition, the court has discretion to consider other factors not listed in Green. Freeman, 503 U.S. at 492-93.

Before a school district is declared unitary, there is a presumption that racial disparities in any of the Green factors are traceable to segregation. Baliles, 829 F.2d at 1311. However, that presumption is overcome when a school district demonstrates that racial disparities are a result, not of its present or past discrimination, but rather external factors,

26

such as demographic changes, beyond the district's control. <u>Missouri v. Jenkins</u>, 515 U.S. 70, 102 (1995); <u>Swann v. Charlotte-Mecklenburg Bd. of Educ.</u>, 402 U.S. 1, 26 (1971); <u>see also</u> <u>NAACP v. Duval Cnty. Sch.</u>, 273 F.3d 960, 966 (11th Cir. 2001). Moreover, "with the passage of time, the degree to which racial imbalances continue to represent vestiges of a constitutional violation may diminish." <u>Freeman</u>, 503 U.S. at 491.

As we explain below, we find that the district court did not clearly err in finding that the school district has eliminated the vestiges of its past discrimination.

B.

1.

The first and "perhaps the most critical <u>Green</u> factor" is whether there remains any racial disparity in student assignment. <u>See</u> <u>Belk</u>, 269 F.3d at 319. When analyzing racial imbalances in student assignment, district courts generally compare the variance between an individual school's ratio of black students to white students to a broader measure of the entire school district's population of black students and white students. <u>See</u> <u>id.</u>

The parties called competing expert witnesses to testify as to the Board's efforts to eliminate racial disparity in student assignment. The Board's witness, Dr. David Armor, reviewed

27

student enrollment data for the Pitt County schools (and the Greenville City schools, pre-merger) from 1968 to 2011.[8] To determine whether the schools were racially balanced post-merger, Dr. Armor applied a plus-or-minus 20% variance comparing the percentage of black students at a particular school to the percentage of black students enrolled at that grade level (i.e., K-5, 6-8, 9-12). Pre-merger, Dr. Armor compared the percentage of black students at a particular school to the overall percentage of black students enrolled in the school district.

Dr. Armor found that, pre-merger, the school boards were successfully able to desegregate their schools and maintain racial balance. He thus concluded that the school district was unitary with respect to student assignment, even before the merger. Following the merger, Pitt County saw substantial population growth with attendant demographic changes. Even so, Dr. Armor found that twenty-six of the thirty-seven schools in the district were racially balanced for twenty or more years, and were also balanced as of the 2011-12 school year.

---

[8] For the years 1968 to 1984, Dr. Armor only had access to student enrollment data for even-numbered years. We do not believe that Dr. Armor's lack of data for odd-numbered years substantially undermines the credibility of his testimony and report. We also note that Plaintiffs' expert relied on this same data for her analysis.

On the other hand, Plaintiffs' student assignment expert, Dr. Genevieve Siegel-Hawley, applied a plus-or-minus 15% variance in comparing the share of black or white students at a particular school to the district-wide share of black or white students.[9] She found that, since 1987, an average of eight schools were racially imbalanced each year. By 2011, fourteen schools were racially imbalanced. Since 2001, three new schools were built that opened with a racial imbalance.

Overall, Dr. Siegel-Hawley concluded that "[d]ownturns in levels of racial imbalance were quickly followed by increases, indicating that [the school district] did not sustain an effective desegregation program for more than a year." J.A. 656. Indeed, she testified that the 2011-12 student assignment plan resulted in a post-merger high of 40% of students attending a racially imbalanced school. Thus, according to Dr. Siegel-Hawley, the Board had failed to eliminate the vestiges of past discrimination in regard to student assignment.

The district court adopted Dr. Armor's metrics and relied primarily on his analysis in finding the school district unitary with respect to student assignment. First, it found that Dr.

---

[9] Before the merger, Dr. Siegel-Hawley compared the white population of an individual school to the white population of the entire school district. Post-merger, Dr. Siegel-Hawley compared the black population of an individual school to that of the entire school district.

29

Armor's use of a plus-or-minus 20% variance was reasonable. While we have previously specifically approved the plus-or-minus 15% variance that Dr. Siegel-Hawley applied, we have also noted approvingly that higher variances have been used by other courts. See Belk, 269 F.3d at 319 (citing the plus-or-minus 20% variance used in Manning v. Hillsborough County School Board, 244 F.3d 927, 935 (11th Cir. 2001)).

Moreover, the district court found that Dr. Armor's comparison (post-merger) of an individual school's racial composition to the student population of that particular grade level was a superior metric to Dr. Siegel-Hawley's comparison to the student population of the school district as a whole. The court agreed with Dr. Armor "that the racial composition of students attending elementary schools within a particular district may be far different from the racial composition of that district's high schools." Everett v. Pitt Cnty. Bd. of Educ., No. 6:69-CV-702-H, slip op. at 14 (E.D.N.C. Sept. 25, 2013).

We believe that the district court's decision to rely on Dr. Armor's report and testimony was not clearly erroneous. See FTC v. Ross, 743 F.3d 886, 894 (4th Cir. 2014) ("In cases in which a district court's factual findings turn on . . . the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference." (internal

30

quotation marks omitted)). And we agree with the district court that, to the extent that racial imbalance remains an issue in the school district, there is substantial evidence indicating that it was caused by white students either leaving the public school system, or moving to more racially segregated neighborhoods.

The Supreme Court has been clear that school districts need not take affirmative measures to correct racial imbalances caused by demographic changes once they have remedied the effects of prior de jure segregation. Freeman, 503 U.S. at 494 ("Once the racial imbalance due to the de jure violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors."); Swann, 402 U.S. at 31-32. Moreover, "[t]he continued existence of a small number of one race schools within . . . a school district does not establish in and of itself a constitutional violation." Riddick, 784 F.2d at 535.

Here, the most striking instance of "white flight" came in response to the Board's aggressive 2006-07 student assignment plan, which "used satellite school [attendance areas] and racial balancing ratios in an effort to reduce the racial isolation of elementary schools in the former Greenville City school district." J.A. 201. The implementation of that plan ultimately resulted in a significant decline in the white

31

student population, much of which left the impacted schools for private schools, home schooling, or other schools in the County.

While the Board was under no duty to implement intensive desegregation efforts given that many of the remaining racially identifiable schools were a consequence of demographic shifts within Greenville, its failed efforts at bringing greater racial balance to Greenville City schools illustrate that any remaining segregation in the school district is a consequence of outside forces that cannot properly be attributed to the Board's prior discriminatory acts. We therefore find no clear error in the district court's finding that the school district is unitary with respect to student assignment.

2.

Next, we consider two Green factors together, faculty and staff assignment. Here, all of the Board's data comes from 2004 and later. Dr. Armor employed a variance of plus-or-minus 10% to compare the number of black faculty and staff at an individual school with the districtwide percentage of black faculty and staff.[10] He found that, since 2004, thirty-one out

---

[10] Plaintiffs argue that there was no basis for Dr. Armor's use of the plus-or-minus 10% variance. We have, however, previously approved the use of an even greater variance--plus-or-minus 15%--with respect to faculty assignment. Belk, 269 F.3d at 326.

of thirty-six schools maintained racial balance in faculty and staff, or were only slightly imbalanced for one or two years.

Furthermore, Dr. Armor testified that nearly all of the schools during that time had a racially mixed administrative staff. In addition, the former district superintendent testified that she specifically considered the diversity that a candidate for a vacant principal or assistant principal position could offer to the school. The Board also introduced evidence showing the efforts the district has made to recruit minority teachers. In short, the district court had sufficient evidence before it to conclude that the Board undertook diligent efforts that ultimately resulted in a racially diverse faculty and administrative staff at its schools.

3.

The next Green factor we consider is the Board's maintenance and provision of adequate school facilities. Plaintiffs do not say that the school district is not unitary with respect to quality of facilities. Rather, they claim that the Board failed to prove that siting decisions are made consistently with the Board's obligation to eliminate the vestiges of past discrimination. The district court disagreed, and we believe that it did not clearly err.

The Board uses a Long Range Facility Plan to "strategically locate schools where residential growth is anticipated." J.A.

33

1029.  It determines when improvements or new construction are necessary based on the overall needs of the individual school and the school district in general.  Since 1990, the district has worked with OREd to determine where to locate new schools.  OREd uses a computer model that determines the "optimal location for a new site that will relieve the current crowding and provide room for anticipated growth."  J.A. 2402.  The Board's evidence adequately demonstrates that new schools are sited according to the needs of the district overall, and that the Board works with OREd in a race-neutral manner to make siting decisions.

4.

We also discern no error in the district court's finding that the school district is unitary with respect to transportation.  The school district provides bus service to all eligible students.  Students qualify for bus transportation, regardless of race, based on the distance between their residences and their assigned schools.  Moreover, travel times are actually longer for white and Hispanic students than for black students.  Thus, we find no basis for questioning the district court's view that students receive transportation to school on a racially nondiscriminatory basis.

5.

34

Finally, the district court did not clearly err in concluding that the school district is unitary with respect to extracurricular activities. The Board's evidence showed that such activities are available in all schools, and there are no race-based barriers to participation. Moreover, students throughout the district are adequately informed about the availability of extracurricular activities. Nor are there financial barriers to participation. We think the Board's evidence was sufficient for the district court to conclude that the district is unitary with respect to this final Green factor.[11]

C.

Our analysis of the Board's efforts to eliminate the vestiges of past discrimination to the extent practicable satisfies us that the district court did not clearly err in also finding that the Board has complied in good faith with the Teel and Edwards desegregation orders. A school district can demonstrate its good faith compliance by showing its "commitment to a constitutional course of action [in which] its policies

---

[11] Despite Plaintiffs' urging, the district court refused to consider disparity in student discipline as an ancillary factor in addition to the Green factors. We find no abuse of discretion in this decision because there was not sufficient evidence in the record demonstrating that the school district targets black students for discipline or otherwise treats them differently in disciplinary matters. See Belk, 269 F.3d at 332.

form a consistent pattern of lawful conduct directed to eliminating earlier violations." Freeman, 503 U.S. at 491. We agree with the district court that the Board has demonstrated commendable good faith in complying with the desegregation orders.

Indeed, we need look no further for proof than the fact that the desegregation orders remained administratively closed for over thirty-five years, during which time the Board undertook the task of integrating the schools relatively undisturbed. Until 2008, no party came before the district court accusing the Board of neglecting or disregarding its obligations under the desegregation orders. And when this case was reopened, it was as a consequence of a dispute regarding the 2006-07 student assignment plan in which certain parents essentially argued that the Board went too far in its efforts to desegregate the schools. Moreover, in the proceedings leading up to the district court's 2009 consent order, Plaintiffs and the Board were both aligned in opposition to the Association's motion for declaration of unitary status.

From the date the district court entered its desegregation orders, school administrators took immediate steps to effectively integrate their schools and move them toward unitary status. In very short order, both school districts had almost completely eliminated racially identifiable schools. While

36

racial imbalance returned over the succeeding years, the respective boards consistently took measures to bring their schools back into balance.

Post-merger, the consolidated Board used satellite attendance areas and busing to maintain racial balance. When demographic factors caused an increase in racially identifiable schools, the Board took reasonable steps to restore balance. Ultimately, a substantial number of schools were able to achieve racial balance, and maintain it as of the 2011-12 school year. In short, we are convinced that the Board has acted in good faith since the entry of the desegregation orders in 1970. We therefore conclude that the district court did not clearly err in finding that the Board satisfied this prong of the unitary status inquiry.

IV.

In sum, the district court did not err by first determining that the Pitt County school district is unitary, and then denying Plaintiffs' motion to enjoin the 2011-12 student assignment plan as moot. And because the district court did not clearly err in finding that the school district is in fact unitary, the judgment of the district court is

AFFIRMED.

WYNN, Circuit Judge, dissenting:

In 2010 parents of minor children attending schools in Pitt County and the Pitt County Coalition for Educating Black Children ("Appellants") sought to enjoin implementation of the Pitt County Board of Education's ("Board") 2011-2012 student assignment plan ("2011-2012 Plan"). Appellants alleged that the 2011-2012 Plan, which resulted in the opening of a racially identifiable school and increased racial imbalance across the school district, and which the Board's own members described as "disappointing . . . for racial balance," J.A. 618, violated the Board's obligations under controlling desegregation orders, including a 2009 consent order that directed the Board to "work toward attaining unitary status." J.A. 204.

The first time the district court considered Appellants' motion, it improperly placed the burden of proof on Appellants. On appeal, we vacated the district court's denial of the motion, and remanded with instructions to apply the Supreme Court-mandated presumption that any racial disparities in 2011-2012 Plan resulted from the School Board's prior unconstitutional conduct in operating a racially segregated school district. Everett v. Pitt Cnty. Bd. of Educ., 678 F.3d 281, 288 (4th Cir. 2012) ("Everett I"). We further held that the School Board bore the burden of proving that the plan "moves the school district toward unitary status" in compliance with a 2009 Consent Order

38

issued by the district court.  Id.  To be sure, at the time of the appeal in 2013, the Board did not dispute that it had yet to obtain unitary status and thus had a duty to eliminate the vestiges of past discrimination and demonstrate good faith compliance with prior desegregation orders.

Our words, it would appear, have fallen upon deaf ears. The district court expressly did not consider whether the Board had met its burden with respect to the 2011-2012 Plan.  Nor did the court substantially take the plan into account when deciding whether the Board had complied in good faith with the 2009 Consent Order.  Instead, it ruled that the school district became unitary in 1986, and thus deemed the Board "released" from the burden that we and the district court's own prior order said it had.  The district court concluded:

> Even assuming, arguendo, that the School Board is unable to meet its burden of proof as to the 2011-2012 plan, an order enjoining the continued implementation of this plan would be pointless since the district court has been declared unitary and no longer has an affirmative duty to ensure that its policies move the district towards unitary status.

J.A. 568-569 (emphasis added).

Yet how could the school district be declared unitary if it never met "its burden of proof as to the 2011-2012 Plan"?  As Everett I stated, in no uncertain terms, satisfying this burden was a condition precedent to the declaration of unitary status.

39

Our consideration of this case does not occur in a vacuum. The rapid rate of de facto resegregation in our public school system in recent decades is well-documented. As one scholar put it, "Schools are more segregated today than they have been for decades, and segregation is rapidly increasing." Erwin Chemerinsky, Separate and Unequal: American Public Education Today, 52 Am. U. L. Rev. 1461, 1461 (2003) (footnote omitted); see also Lia B. Epperson, Resisting Retreat: The Struggle for Equity in Educational Opportunity in the Post-Brown Era, 66 U. Pitt. L. Rev. 131, 145 (2004) ("American public schools have been steadily resegregating for more than a decade, dismantling the integrative successes of hundreds of districts that experienced significant levels of integration in the wake of Brown and its progeny. Such racial isolation in public schools is worse today than at any time in the last thirty years.").

Today the majority upholds the Board's promulgation of a student assignment plan that, Appellants argue, furthers this trend. The majority reaches that result out of deference to a district court decision that utterly fails to analyze the facts in this case in compliance with this Court's instructions and established Supreme Court precedent.

Though it is pleasing to hear that the district court takes comfort in the Supreme Court's recent proclamation in Shelby County v. Holder, 133 S. Ct. 2612, 2625-26 (2013), that "our

40

Nation has made great strides" in ensuring the civil rights of minorities since the 1960s, see J.A. 569, these words are not a panacea for difficult cases involving race, particularly when the "facts on the ground" "caution[] . . . against" resting on the laurels of prior generations. League of Women Voters of N. Carolina v. N. Carolina, 769 F.3d 224, 243 (4th Cir. 2014) cert. denied, No. 14-780, 2015 WL 1510878 (U.S. Apr. 6, 2015). Undeniably, in certain cases, there are other famous words that ring all the more true: "The past is never dead. It's not even past."[1]

The district court's errors here are twofold and interrelated: First, the district court failed to consider the effects of the 2011-2012 Plan when determining whether the School Board complied in good faith with prior orders, a condition precedent to the district court's declaration of unitary status. Second, and relatedly, the district court gave retroactive effect to its declaration of unitary status so as to retroactively release the Board of its obligations under controlling desegregation orders in direct contravention of this Court's opinion in Everett I. The district court's order should not be affirmed. It should be vacated and remanded for proceedings consistent with our opinion in Everett I and

---

[1] William Faulkner, Requiem for a Nun 92 (1951).

41

controlling Supreme Court precedent. Accordingly, I respectfully dissent.

I.

The Supreme Court declared discrimination on the basis of race in public education unconstitutional in 1955, yet, the "deliberate speed," Brown v. Bd. of Educ. of Topeka, Kan., 349 U.S. 294, 301 (1955), of integration did not reach Pitt County, North Carolina until 1970. Two separate lawsuits filed in the 1960s in the Eastern District of North Carolina seeking the desegregation of Pitt County and Greenville City Schools, which at the time were operated as two separate school systems. See Teel v. Pitt County Board of Education, Civ. A. No. 569 (E.D.N.C. filed August 10, 1970); Edwards v. Greenville City Board of Education, Civ. A. No. 702 (E.D.N.C. filed July 7, 1970). In those cases, from which this case arises, the district court determined that Pitt County and Greenville City Schools were operating racially segregated dual school districts in violation of the Fourteenth Amendment.

As the majority describes, after the school systems' proposed desegregation plans were finally approved, the Teel and Edwards cases remained dormant for over three decades until the Greenville Parents Association ("GPA"), a group of predominantly white parents, filed a complaint with the U.S. Department of

Education Office for Civil Rights, objecting to the Board's use of race in its student assignment plan for the 2006–2007 academic year.

The GPA's challenge to that plan culminated in a 2009 settlement to which Appellants and the Board were parties. The settlement recognized that the parties "believe that unitary status for [Pitt County Schools] is a salutary goal, and all parties pledge to work together to achieve that goal." J.A. 195. On November 4, 2009, the district court issued an order approving the settlement ("2009 Consent Order"). In addition to incorporating the terms of the parties' settlement agreement, the 2009 Consent Order further obligated the parties to "work toward attaining unitary status so that the [district] court may relinquish jurisdiction over this case and restore to the School Board full responsibility for the operation of its schools." J.A. 204 (emphasis added). The 2009 Consent Order also directed the parties to submit, on or before December 31, 2012, "a report detailing the School Board's efforts and progress in achieving unitary status and eliminating the vestiges of past discrimination to the extent practicable." J.A. 204.

To assist in its formulation of the 2011-2012 Plan, the Board enlisted the Operations Research and Education Laboratory of North Carolina State University. After considering the three scenarios outlined in the majority opinion, in November 2010 the

43

Board settled on the 2011-2012 Plan. Plaintiff's expert testified that the plan adopted by the Board was the most segregative option it considered. And even according to the Board's expert's methodology, three schools—C.M. Eppes, South Greenville, and G.R. Whitfield—became racially imbalanced as a result of the 2011-2012 Plan. Also, Lakeforest Elementary opened as a "racially identifiable school," with nearly 80% black enrollment. J.A. 558.

Some of the Board's own members appeared to question whether the 2011-2012 Plan was consistent with the Board's obligations under controlling desegregation orders. For instance, Board Member Tolmie, noting that the plan would open Lakeforest with only 12% white enrollment and make South Greenville Elementary 17% white, found the plan "disappointing . . . for racial balance." J.A. 618. He believed that "there must be a better map for diversity." J.A. 618. Others believed the plan would compromise opportunity for some students and inhibit the district's efforts to achieve unitary status.

On April 19, 2011, Appellants filed a motion for injunctive and other appropriate relief seeking to enjoin the implementation of the 2011-2012 Plan, arguing that it violated the Board's obligation to move the district toward unitary status. The district court construed Appellants' motion as a request for a preliminary injunction. Because the court

44

determined that Appellants had failed to demonstrate a likelihood of success on the merits, it denied the motion.

Appellants appealed to the Fourth Circuit, and this panel vacated the decision and remanded, concluding that the district court had improperly placed the evidentiary burden on Appellants. Everett I, 678 F.3d at 289. Specifically, we held:

> Given that there is no dispute that the school district has not attained unitary status, the evidentiary burden should have been on the School Board to prove that the 2011–12 Assignment Plan is consistent with the controlling desegregation orders and fulfills the School Board's affirmative duty to eliminate the vestiges of discrimination and move toward unitary status.

Id. at 290. We further noted that "the 2009 Consent Order does not settle the core dispute that arose in the 1960s and 1970s, namely, the School Board's unconstitutional operation of a dual school system and its continuing affirmative obligation to eliminate the vestiges of discrimination and move toward unitary status." Id. at 290 n.8 (emphasis added).

On July 6, 2012, the Board filed a motion for unitary status, arguing that the school system was unitary as of 2000. Over Appellants' objection, the district court decided to consider the Board's motion for unitary status together with Appellants' remanded motion to enjoin the 2011-2012 Plan.

The district court conducted a five-day bench trial in July 2013. The Board's expert, Dr. Armor, concluded that as of 1986,

45

nearly three decades ago, Greenville City Schools and Pitt County Schools had each obtained unitary status and that any subsequent imbalance was not a vestige of de jure discrimination, but rather was due to demographic changes. In reliance on Dr. Armor's testimony, the district court concluded that prior to the 1986 merger, both the Greenville City Schools and the Pitt County Board of Education successfully implemented their court-ordered plans, fully desegregated all schools within both districts, and maintained a high level of integration until merger.

The district court further concluded that post-merger, the Board adopted policies to maintain racial balance and succeeded in the vast majority of schools and found that significant demographic shifts had occurred in the post-merger period. In this analysis, the district court only briefly mentioned the 2011–12 Plan. Importantly, the district court acknowledged that it made no effort to determine whether the Board met its burden of demonstrating that "the 2011–12 Assignment Plan is consistent with the controlling desegregation orders and fulfills the School Board's affirmative duty to eliminate the vestiges of discrimination and move toward unitary status." Id. at 290 n.8. Rather, the court assumed that it did not, without deciding the issue, and determined that Appellants' motion for injunctive relief was moot, stating:

> Even assuming, arguendo, that the School Board is unable to meet its burden of proof as to the 2011-2012 plan, an order enjoining the continued implementation of this plan would be pointless since the school district has been declared unitary and no longer has an affirmative duty to ensure that its policies move the district toward unitary status.

J.A. 568-569 (emphasis added).[2]


## II.

## A.

For a court to release a school district from prior desegregation orders, a school district must "comply in good faith with [school desegregation orders]." Everett I, 678 F.3d 281 (citing Bd. of Educ. v. Dowell, 498 U.S. 237, 248–50 (1991)). In determining whether a school board has shown a good faith commitment to prior desegregation orders, courts look to whether the school board's policies "form a consistent pattern of lawful conduct directed to eliminating earlier violations." Freeman v. Pitts, 503 U.S. 467, 491 (1992).

The Supreme Court has explained the rationale for requiring a showing of good faith compliance:

---

[2] Even the majority opinion concedes in footnote 7 that "by determining that Plaintiffs' motion to enjoin the 2011-12 student assignment plan was moot, the district court necessarily found--even if it did not say so expressly--that the school district was unitary at the time of the implementation of the 2011-12 plan," and that the district court had found that the two then-separate districts were unitary as to student assignment. Ante at 14.

47

A history of good-faith compliance is evidence that any current racial imbalance is not the product of a new de jure violation, and enables the district court to accept the school board's representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future.

Id. at 498-99. The importance of the good faith requirement is particularly salient in this case, where the parties entered into a settlement in 2009, memorialized in the district court's 2009 Consent Order, which required the Board to move the district towards unitary status. As a result of the settlement, parents of school children forwent legal action in favor of a cooperative agreement premised on the Board's commitment to working towards the laudable goal of a racially balanced school system. Whether the board complied in good faith with that directive would be undeniably probative of its commitment to maintaining a racially balanced school system even after the desegregation orders were lifted and the district court relinquished jurisdiction over the case. Such a determination is important not only to instill confidence in the district court when it decides whether to release the district from its purview, but also to the stakeholders in this litigation consisting primarily of parents of minor school children.

In concluding that the Board had complied in good faith with prior desegregation orders, the district court found that the pre-merged school systems had fully implemented the Teel and

48

Edwards orders in a short period of time and had sought faithfully to comply with those orders notwithstanding considerable demographic shifts in the district in the intervening years. The district court also stated that the Board's reluctance to seek a declaration of unitary status was evidence that the Board was committed to continued integration of its schools.

Yet the district court failed to substantially account for the Board's actions in the wake of the 2009 Consent Order. Appellants argue that the Board's adoption of the 2011-2012 Plan, which came on the heels of the 2009 Consent Order and resulted in more rather than fewer racially imbalanced schools in the district constituted a violation of the Board's obligation to move towards unitary status under with the 2009 Order. Indeed, applying Dr. Armor's metrics for assessing racial imbalance, C.M. Eppes, South Greenville, and G.R. Whitfield schools all became racially imbalanced as a result of the 2011-2012 Plan. Lakeforest Elementary opened as a racially identifiable school with a black population of nearly 80%. In the view of Appellants' expert, the plan adopted by the Board was the most segregative option it considered. Board members questioned whether the 2011-2012 Plan satisfied the Board's obligations to eliminate racial imbalance in its schools. Board Member Tolmie found the plan "disappointing . . . for racial

49

balance" and believed that "there must be a better map for diversity." J.A. 618. Others echoed similar sentiments.

As has long been recognized, a court clearly errs when it fails to consider substantial evidence contrary to its ultimate finding. Miller v. Mercy Hosp., Inc., 720 F.2d 356, 361 (4th Cir. 1983). Given that the Board had alternatives available that would result in higher levels of racial balance in the district, and acted with full awareness of the regressive impacts on the school district's racial balance, the Board's decision to adopt that approach, at the very least, ought to have received closer scrutiny from the district court.

Thus, the district court's finding that the Board complied in good faith with prior desegregation orders should be vacated and the case remanded for further consideration.

B.

What is perhaps even more troubling about the district court's decision is that by failing to consider the impacts of the 2011-2012 Plan, the district court effectively made retroactive its declaration of unitary status.

In Everett I, we stated:

> Even if we assume that the district court will fully consider the issue of unitary status in December 2012, this does not absolve the School Board from the burden of demonstrating to the district court, as Green v. Cnty. Sch. Bd., 391 U.S. 430 (1968), and its progeny require, that the 2011–2012 Assignment Plan moves the school district toward unitary status, particularly

50

> where this plan allegedly causes immediate and
> substantial adverse effects on students.

678 F.3d at 288. We further explained, "Any other conclusion would necessarily, but impermissibly, provide the School Board with latitude to discriminate pending the resolution of some future hearing." Id. at 288. Cf. Capachione v. Charlotte-Mecklenburg Bd. of Educ., 57 F. Supp. 2d 228, 285 (W.D.N.C. 1999) ("[A] unitary status determination is not retroactive, and therefore, the termination of court supervision today cannot relate back to an earlier time."). By declaring the district unitary and its burden with respect to the 2011-2012 plan moot, the district court has directly contravened our instructions. That is precisely what the district court's decision and the majority's affirmance of that decision does here. Such a holding has troubling implications: will others bound by desegregation orders take the majority's holding as a signal that de facto unitary status in the eyes of a school district gives the school district license to act as though it were not under court order?

The majority justifies its ruling by pointing to School Board of Richmond v. Baliles, 829 F.2d 1308, 1312 (4th Cir. 1987), yet the procedural posture of this case differs significantly from that of Baliles, particularly in light of the 2009 Consent Order in this case. Moreover, the majority

51

opinion's reading of <u>Baliles</u> directly conflicts with our holding in <u>Everett I</u>. In <u>Baliles</u>, plaintiffs sought to force Virginia to fund programs designed to eliminate vestiges of segregation. The district court ruled that, because the school district had already achieved unitary status as a factual matter, the burden shifted to the plaintiffs to prove their case. 639 F. Supp. at 687 & n.3 (citing <u>Riddick v. Sch. Bd.</u>, 784 F.2d 521, 534, 538 (4th Cir. 1986)).

This Court ruled in <u>Everett I</u> that the burden of proof remained with the Board to prove "that the 2011–12 Assignment Plan is consistent with the controlling desegregation orders and fulfills the School Board's affirmative duty to eliminate the vestiges of discrimination and move toward unitary status." <u>Everett</u>, 678 F.3d at 29. The Board was further obligated to demonstrate good faith compliance with prior orders including the 2009 Consent Order which immediately preceded the promulgation of the 2011-2012 Plan. Nothing in <u>Baliles</u> entitles the district court to ignore that directive.

### III.

In failing to fully address the impacts of the 2011-2012 Plan, the district court declined to determine whether the School Board complied in good faith with prior orders, and retroactively relieved the Board of obligations under those

52

orders.  The district court's declaration of unitary status should be vacated, and this case remanded.  For the foregoing reasons, I respectfully dissent.